78 P.3d 1

SAVE SUNSET BEACH COALITION; Life of the Land; Larry McElheny; Benjamin Hopkins; and Peter Cole, Plaintiffs–Appellants,

v.

The CITY AND COUNTY OF HONOLULU; Obayashi Corporation; and Obayashi Hawai'i Corporation, Defendants–Appellees.

No. 21332.

Supreme Court of Hawai'i.

Oct. 20, 2003.

468

William W. Saunders, Jr. and James J. Bickerton, Honolulu, (Bickerton Saunders Dang & Bouslog), on the briefs, for plaintiffs-appellants.

Jane Howell, Deputy Corporation Counsel, City & County of Honolulu, on the briefs, for defendant-appellee The City & County of Honolulu.

John T. Komeiji, Lyle Y. Harada, & Lloyd S. Yoshioka (Watanabe, Ing & Kawashima), on the briefs, for defendants-appellees Obayashi Corporation & Obayashi Hawai'i Corporation.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold that in connection with the complaint filed by Plaintiffs-Appellants Save Sunset Beach Coalition, Life of the Land,[1] Larry McElheny, Benjamin Hopkins, and Peter Cole (Plaintiffs), the first circuit court (the court) correctly applied the propositions stated below except for the last two; the effect of such error, however, was harmless.

First, the rezoning[2] by Defendant-Appellee City and County of Honolulu (the City) of 765 acres of land located on the North Shore of O'ahu and designated for "agricultural use"[3] to a "country district" designation[4] was a legislative act and thus is accorded deference on judicial appeal. Accordingly, the opponents of such a rezoning must demonstrate that the rezoning was "arbitrary, unreasonable or invalid[,]" *Lum Yip Kee v. City and County of Honolulu,* 70 Haw. 179, 187, 767 P.2d 815, 820 (1989), in order to have the rezoning vacated or reversed. Second, Article XI, section 3 of the Hawai'i State Constitution, which pertains to the preservation of agricultural lands and requires a two-thirds vote to approve any reclassification or rezoning of such lands, is not self-executing. Third, the four guidelines in a City zoning ordinance, ROH § 21–5.30(c),[5] which concern

---

1. Plaintiffs Save Sunset Beach Coalition and Life of the Land are non-profit corporations organized and existing under laws of the State of Hawai'i with their principal places of business in Honolulu, Hawai'i. Other plaintiffs are residents of the North Shore of Oahu.

2. "Rezoning" is the act of changing the designated zoning applicable to an area of land. *See Webster's Third New Int'l Dictionary* 1945 (1986) (defining the term "rezone" as "to zone anew"); *see also* Daniel R. Mandelker, *Land Use Law* § 6.25 (5th ed.2003).

3. Under HRS § 205–2(a) (1993), "[t]here shall be four major land use districts in which all land in

the State shall be placed: urban, rural, agricultural, and conservation." The land in question in the instant case is designated "agricultural."

4. Pursuant to Hawai'i Revised Statutes (HRS) § 205–5 (2001), "the powers granted to the counties under section 46–4 *shall govern the zoning within the districts,* other than in conservation districts." (Emphasis added.)

5. ROH § 21–5.30 describes the purpose of country districts and enumerates four guidelines for identifying potential country district lands. It states:

(a) The purpose of the country district is to recognize and provide for areas with limited

the identification of so called "country district" lands, are directory and not mandatory. Fourth, the uses within a City designated "Country" zone may not be broader than the permitted uses authorized by HRS § 205–4.5 (2001), but may be more restrictive. Fifth, the specific issue of whether the uses permitted in country zoning as applied in this case is not ripe for review. Finally, whether an attorney-client privilege has been waived through an inadvertent disclosure of a protected item is judicially determined through a consideration of the circumstances surrounding the disclosure.

Accordingly, for the reasons stated herein, we affirm the court's January 30, 1998 final judgment.

## I.

### A.

Plaintiffs oppose a proposed residential development on state-designated agricultural district lands located on bluffs overlooking Sunset Beach. The land in question consists of several large parcels owned by Defendants–Appellees Obayashi Corporation and Obayashi Hawai'i Corporation (Obayshi). The total size of this area is approximately 1143.6 acres. The land itself is generally depicted as two plateaus, divided by cliffs and ravines. Obayashi attests that several types of intensive commercial farming were previously attempted on this property, but were abandoned due to "steep terrain, poor access, lack of appropriate irrigation, and the isolated pockets of good agricultural land."

In December of 1993, Obayashi proposed the development, designated as the "Lihi Lani Project," wherein agricultural activity would be integrated with 315 large acre country lots; fifty single family homes; eighty elderly rental units; fifty residences; a YMCA facility; and a variety of trails, parks, and open space. Of interest on this appeal, each proposed country lot contains land designated as an "agricultural easement," to be used for field stock and fruit trees. In addition, a profit sharing agreement is planned for the sale of agricultural products from the remaining acres, which are reserved solely for agricultural use. Plaintiffs contend that the proposed homes on these lots are expensive ranch-style houses, contrary to the intent of an agriculture district designation.

On October 26, 1994, the state Land Use Commission (LUC) approved a land use district boundary amendment [6] that reclassified 57.3 acres of the property from agricultural to urban land use district.[7] This approval is uncontested in the instant case.

---

potential for agricultural activities but for which the open space or rural quality of agricultural lands is desired. The district is intended to provide for some agricultural uses, low density residential development and some supporting services and uses.

(b) It is the intent that basic public services and facilities be available to support the district but that the full range of urban services at urban standards need not be provided. Typically, the country district would be applied to areas outside the primary and secondary urban centers, which are identified by city adopted land use policies.

(c) *The following guidelines shall be used to identify lands which may be considered for this district:*

 (1) Lands which are within the State-designated Urban District and designated either agricultural or residential by adopted city land use policies.

 (2) Lands which are not predominantly classified as Prime, Unique, or Other under the [ALISH] system.

 (3) Lands where a substantial number of existing parcels are less than two acres in size.

 (4) Lands where existing public facility capabilities preclude more intense development. (Emphasis added.).

6. HRS § 205–3 (2001) states that "[l]and use boundaries existing as of June 2, 1975, shall continue in full force and effect subject to amendment as provided in this chapter[.]" HRS § 205–3.1 (2001) relates that "[d]istrict boundary amendments involving land areas greater than fifteen acres shall be processed by the land use commission pursuant to section 205–4." In turn, HRS § 205–4 (2001) provides procedures and requirements for the land use commission to follow in amending district boundaries.

7. As noted before, HRS § 205–2(a) states that there are four major land use districts, "urban, rural, agricultural, and conservation." HRS § 205–2(b) states that "[u]rban districts shall include activities or uses as provided by ordinances or regulations of the county within which the urban district is situated."

Before development could begin, Obayashi attempted to obtain from the City and County of Honolulu (the City) an amendment to the North Shore Development Plan Use Map,[8] a Special Management Area Permit for 28 acres of land for the proposed elderly housing and the YMCA facility,[9] and a zoning reclassification of several hundred acres of land from general agriculture (also known as "AG–2")[10] to country designation. The State Department of Agriculture, pursuant to HRS § 141–1(8) (1993),[11] is charged with reviewing and making recommendations with respect to agricultural planning and development. It submitted a letter to the City stating that Lihi Lani project was "progressive" and more agriculturally defined then most approved agricultural subdivisions. After reviewing the proposed development, the City Planning Department and the City Department of Land Utilization recommended approval. Thereafter, several public hearings were held before the City Council at Honolulu Hale, and at the Kapolei and Haleiwa Elementary Schools. The City Council heard hours of testimony, including that of Plaintiffs.

On May 19, 1995, five days before the City Council voted on the proposed change, Plaintiffs filed a complaint in the court. Copies of this complaint were circulated to the City Council on the same day, as well as a letter from Plaintiffs' attorney suggesting that the City Council postpone its final vote on the Lihi Lani project so that the land use laws could be more closely studied in the hopes of "avoid[ing] a protracted legal battle."

8. In *Lum Yip Kee, Ltd.*, 70 Haw. at 182, 767 P.2d at 817, this court explained that the 1973 Revised Charter of the City and County of Honolulu (Charter) was amended "for creation of eight 'development plans' for the City and County of Honolulu." A development plan is a "relatively detailed scheme[ ] for implementing and accomplishing the development objectives and policies of the general plan within the several parts of the city." *Id.* (citing Charter § 5–409). In addition, [e]ach development plan consists of a textual component and a map component. The textual component contains statements of standards and principles with respect to land uses within the area, design principles and controls, the desirable sequence of development, and other factors important to the orderly implementation of the General Plan. The development plan "Land Use Map" indicates the location of various uses such as residential, recreation and parks, agricultural, commercial, military, and preservation. The "Public Facilities Map" shows the existing and future location of roads and streets, sewer lines and other proposed facilities.
*Id.* at 182, 767 P.2d at 817–18 (Citations omitted). Honolulu's general plan has been described as a long range plan setting forth various policies for new development.
Designed to cover a wide range of objectives, the Honolulu general plan is supposed to "set forth the city's broad policies for the long range development of the city," addressing the general social, economic, environmental, and design needs of the city. It includes within its purview policy and development objectives relating "to the distribution of social benefits, the most desirable uses of land within the city, the overall circulation pattern and the most desirable population densities" within the city. The development plans are supposed to implement the general plan's goals.

D. Callies, *Regulating Paradise: Land Use Controls in Hawai'i* 26 (1984) (footnote omitted).

9. Pursuant to HRS § 205A–22 (2001), a " '[s]pecial management area use permit' means an action by the authority authorizing development the valuation of which exceeds $125,000 or which may have a substantial adverse environmental or ecological effect, taking into account potential cumulative effects." *See also Curtis v. Board of Appeals, County of Hawai'i*, 90 Hawai'i 384, 389 n. 5, 978 P.2d 822, 827 n. 5 (1999).

10. According to ROH § 21–2.10 (1990), there are two agricultural zones, "restricted" and "general" with the map designation of "AG–1" and "AG–2" respectively.

11. HRS § 141–1(8) states:

Planning and development. *Administer a program of agricultural planning and development, including the formulation and implementation of general and special plans, including but not limited to the functional plan for agriculture;* administer the planning, development, and management of agricultural park projects; *review, interpret, and make recommendations with respect to public policies and actions relating to agricultural land use;* assist in research, evaluation, development, enhancement, and expansion of local agricultural industries; *and serve as liaison with other public agencies and private organizations for the above purposes.* In the foregoing, the department of agriculture shall act to conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency, and ensure the availability of agriculturally suitable lands.
(Emphases added.).

On May 24, 1995, the City Council passed, by a 5–to–4 vote, bill number 89 granting a development plan amendment, resolution number 94–232 approving a SMA permit, and bill number 88 to rezone 765 acres from AG–2 to country designation.

## B.

On June 8, 1995, Plaintiffs filed an amended complaint challenging, in effect, the development plan amendment, the Special Management Area Permit, and the zoning reclassification on both constitutional and statutory grounds and requesting injunctive and declaratory relief.[12]

On December 5, 1995, a pretrial protective order was issued regarding a legal memorandum requested by the Plaintiffs from Obayashi, titled "State Agricultural District Restrictions."[13] This memorandum was listed as a reference in an environmental impact statement (EIS)[14] prepared by University of Hawai'i Professor emeritus Dr. Frank Scott on behalf of Obayashi. The court found that the memorandum was inadvertently disclosed to Dr. Scott, but held that the attorney-client privilege was not waived.

On October 10, 1995, Obayashi filed a motion to dismiss or for summary judgment as to all counts. On January 5, 1996, the City filed a joinder in Obayashi's motion to dismiss or for summary judgment. On January 9, 1996, Plaintiffs filed a counter-motion for summary judgment.

On March 27, 1996, an order of dismissal was granted regarding counts II, III, IV, and V of the Plaintiffs' complaint on the ground that the issues raised were "premature."[15] In the order, the court expressly concluded that "no formal development plan or permit application has been submitted or final agency action taken."[16] The court also denied

---

12. In Count I, Plaintiffs asserted that the City did not comply with the requirements of Article IX, section 3 of the Hawai'i State Constitution in its purported rezoning of Defendants' property and consequently they are entitled to both declaratory and injunctive relief that would enjoin the rezoning. Count II of Plaintiff's complaint alleged that Obayashi's residential development was inconsistent with the State's "agricultural" designation and the Country Land Use Ordinance, and Plaintiffs were entitled to declaratory and injunctive relief enjoining the development under this "agricultural" land use classification. In Count III, Plaintiffs alleged that the City's actions violated the State and County land use laws and ordinances. Counts IV and V purport that Defendants submitted an "agricultural cluster" development which did not qualify as a "farm dwelling" within the meaning of HRS Chapter 205 and violates Land Use Ordinance maximum density restrictions. Count VI asserts that the proposed "country" zoning is also inconsistent with State "agricultural" designation and violates the Land Use Ordinance. Count VII maintained that the development plan amendment procedures violated the Land Use Ordinance and City Charter because it is unlawful to amend the plan "on an *ad hoc* basis prior to completion of the Planning Director's pending biennial Development Plan review." To this end, count VIII also argued that the amendment and zoning procedures violated HRS § 46–4 (1993), because it was not "accomplished within the framework of a long range, comprehensive general plan prepared or being prepared to guide the overall future development of the county." Count IX alleged that the permit application was insufficiently detailed to adequately assess conditional uses of the project. And, finally, Count X

asserted that there is a substantial likelihood that Plaintiffs would prevail on the merits, and thus Plaintiffs were entitled to interim injunctive relief in the form of a temporary restraining order, preliminary injunction, or other appropriate interim relief.

13. The Honorable Judge Daniel G. Heely presided over this matter.

14. An EIS is defined as "an informational document prepared in compliance with the rules adopted under section 343–6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic and social welfare of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects." HRS § 343–2 (1993).

15. The Honorable Judge Colleen K. Hirai presided over the motions to dismiss and the motions for summary judgment.

16. In its motion to dismiss or for summary judgment, Obayashi stated that it had yet to comply with the requirements of ROH § 21–8.30–6 ("Before the submission of a cluster housing, agricultural or country cluster application, the applicant may undergo a 21 day conceptual review of the project by submitting a preliminary site plan drawn to scale showing the approximate location and dimensions of all proposed structures, roadways, common open areas and recreational facilities."). *See also* ROH § 21–6.50–3 ("All cluster

Plaintiffs' request for a temporary restraining order.

On September 9, 1997, a jury waived trial [17] based on stipulated evidence was held on the remaining claims in the amended complaint, namely counts I, VI, VII, VIII, IX and X. On October 15, 1997, the court issued findings and conclusions in favor of Defendants–Appellees City and Obayashi (collectively Defendants) as to all the remaining counts. On January 30, 1998, final judgment was entered in favor of the City and Obayashi and against Plaintiffs. On February 4, 1998, Plaintiffs filed a notice of appeal.

## II.

On appeal, Plaintiffs contest only the City's rezoning of 765 acres of land from AG–2 to country designation for the 315 country lots by City Council bill number 88,[18] and the granting of the discovery order preventing the production of the legal memorandum prepared for Obayashi. Plaintiffs do not challenge the dismissal of counts II, III, IV, and V.

Plaintiffs raise essentially the following arguments: (1) the City's act of rezoning the land from agricultural to country was a quasi-judicial act and, thus, directly reviewable by this court on a *de novo* basis; (2) Article XI, section 3 of the Hawai'i State Constitution is self-executing and requires a two-thirds majority vote to approve the zoning change; (3) because no standards and criteria have been designated by the legislature pursuant to Article XI, section 3, no "important" agricultural lands may be rezoned; (4) there was no requirement that the legislature specifically designate agricultural lands as "important" under Article XI, section 3, as the drafters intended to adopt standards published just prior to the 1978 constitutional convention; (5) the Country zoning change conflicts with ROH § 21–5.30(c); (6) the City's approval of country zoning exceeded statutory authority granted it under HRS chapter 205 and was inconsistent with the State's agricultural district designation of the land; and (7) the court erred in issuing the December 5, 1995 protective order.[19]

## III.

### A.

■ As to Plaintiffs' first argument on appeal, and in connection with the proper standard of review, we must decide whether rezoning of property by a county ordinance is a quasi-judicial or legislative action. Plaintiffs argue that the rezoning affects only the property of Obayashi and accordingly the proposed changes should be subjected to a higher standard of review. To support this contention, Plaintiffs cite an Oregon case which states that

housing applications shall be processed in accordance with Section 21–8.30–6."); ROH § 21–5.30–3(b) ("Country clusters shall be processed in accordance with Section 21–8.30–6."). Presumably, the court made its conclusion based upon this submission.

In its answering brief on appeal, Obayashi additionally maintains that individual lots must be established by approving a subdivision of the property, *see* ROH § 22–3.3 ("No person shall subdivide or consolidate any land unless the plans therefor conform to the provisions of this article ... and have been duly approved by the director."), grading and building permits must be approved, and approvals obtained for the specific items like a wastewater treatment plant and campgrounds.

17. The Honorable Karen K. Blondin presided over this trial.

18. As noted by Obayashi, Plaintiffs do not challenge either the development plan amendment or the Special Management Area permit.

19. Plaintiffs contest several findings and conclusions, insofar as they are supportive of the aforementioned arguments on appeal. Each of these challenged findings and conclusions is addressed with the related issue discussed herein: (1) finding number 50, relating to the number of acres classified under the ALISH system, *see infra* note 22; (2) finding number 61, indicating that the guidelines in ROH § 21–5.30(c) were utilized by the City in approving the zoning change, *see infra* part VIII.; (3) finding number 64 stating that there was insufficient evidence to demonstrate that the zoning change from agriculture to country was inconsistent or violated HRS chapter 205, *see infra* part IX.; (4) conclusion number 5 maintaining that Bill 88 did not violate Article XI, Section 3 of the Hawai'i State Constitution, *see infra* part III.; and (5) conclusion number 6 ruling that Plaintiffs did not demonstrate that the rezoning violated ROH § 21–5.30 or HRS chapter 205, *see infra* parts VIII.-XIII.

[An a]ction is legislative when it affects a large area consisting of many parcels of property in disparate ownership.... Conversely, action is considered quasi-judicial when it applies a general rule to a specific interest, such as a zoning change affecting a single piece of property, a variance, or a conditional use permit.

*Allison v. Washington Co.*, 24 Or.App. 571, 548 P.2d 188, 190–91 (1976) (quoting *Fasano v. Board of County Comm'rs*, 264 Or. 574, 507 P.2d 23 (Or.1973)). Contrary to the Plaintiffs' position, this standard appears applicable only to "spot zoning." This court has defined spot zoning as

an arbitrary zoning action by which a small area within a large area is singled out and specially zoned for a use classification different from and inconsistent with the classification of the surrounding area and not in accord with [a] comprehensive plan.

*Life of the Land v. City Council*, 61 Haw. 390, 429, 606 P.2d 866, 890 (1980). The usual presumption of validity may not be accorded spot zoning because of the absence of widespread community consideration of the matter.

[A] determination of the use of a specific and relatively small parcel will affect only the parcel owner and the immediate neighbors. When that is the case, limited community interest will mean little or no public debate. *This limited interest, in turn, elevates concern over whether the rights of the individuals affected are adequately safeguarded, and deference is inappropriate.*

J.C. Juergensmeyer, T.E. Roberts, *Land Use Planning and Control Law* 191 (1998) (emphasis added). Here, however, there is no indication of arbitrariness or concern over whether rights have been properly safeguarded, *see Life of the Land*, 61 Haw. at 429, 606 P.2d at 890, inasmuch as the property encompasses a large area and substantial public comment and deliberation took place. Therefore, further spot zoning analysis is unnecessary.

## B.

■ The City rezones by ordinance. *See* HRS § 46–4 (1993) ("Zoning shall be one of the tools available to the county to put the general plan prepared or being prepared to guide the overall future development of the county."); *see generally* Charter § 6–1514 ("The council shall, after public hearings, enact zoning ordinances which shall contain the necessary provisions to carry out the purposes of the general plan and development plans."). Although this court has stated, in *dictum*, that rezoning is a "legislative action of the city council," *Kailua Comty. Council v. City & County of Honolulu*, 60 Haw. 428, 432, 591 P.2d 602, 605 (1979), we have never expressly held that rezoning is a legislative function. We do so now.

In *Lum Yip Kee*, this court considered whether an ordinance adopted by the City altering the designation of a small parcel of property from high to low density apartment use was valid. 70 Haw. at 184–85, 767 P.2d at 819. A second ordinance, passed by an initiative vote, not only redesignated the property on the development map, but also "down-zoned" the property. *Id.* This second initiative was found to be invalid at the trial court level, and the City appealed this ruling. *Id.*

On appeal, the landowner argued that (1) the ordinance was not in conformity with the general plan because the council was merely a "rubber stamp" to the voter initiative and thus did not comply with the Hawai'i State Planning Act, HRS Chapter 226; and (2) the ordinance was illegal "spot zoning," because the surrounding areas contained high density apartments. In holding that the original city council ordinance was valid, this court stated that "[t]he enactment of and amendments to development plans constitute legislative acts of the city council, ... and as such they are entitled to a presumption of validity." *Id.* at 190, 767 P.2d at 822 (citations omitted). Accordingly, the "challenger of the ordinance bears the burden of showing that it is arbitrary, unreasonable or invalid." *Id.* (citations omitted).

In *Lum Yip Kee* this court did not reach the City's appeal of the second ordinance and did not address whether the zoning change was subject to the same standard accorded to amendment of the development plan. *Id.*

Although an amendment to a development plan differs from a zoning ordinance, *see id.* at 191 n. 13, 767 P.2d at 823 n. 13 ("We note at the outset that the ordinance challenged by Lum Yip Kee is not a 'zoning' ordinance. Rather, the ordinance in question amended the development plan to change the land use designation[.]"), both types of ordinances "predetermine[ ] what the law shall be for the regulation of future cases falling under its provisions[,]" *Life of the Land*, 61 Haw. at 423, 606 P.2d at 887, rather than merely "execute[ ] or administer[ ] a law already in existence[,]" *id.* at 424, 606 P.2d at 887. Accordingly, we conclude that a zoning ordinance is a legislative act and is subject to the deference given legislative acts. *Accord* J. Juergensmeyer & T. Roberts, *Land Use Planning and Control Law* 188 (1998) ("Most states treat all zoning changes, whether general or site-specific, as legislative acts and accord them a presumption of validity."); D. Callies, *Regulating Paradise: Land Use Controls in Hawai'i* 34 (1984) (explaining that "most courts regard the rezoning process as legislative").

## IV.

▮ Plaintiffs's second argument on appeal is that Article XI, section 3 of the Hawai'i State Constitution required an affirmative two-thirds vote of the City Council to pass Bill Number 88, rather than the majority 5–to–4 vote taken. *See* Charter § 3–107.1 (stating that "except as otherwise provided, the affirmative vote of a majority of the entire membership shall be necessary to take any action"). Article XI, section 3 states that

> [t]he State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands. *The legislature shall provide standards and criteria to accomplish the foregoing.*
>
> Lands identified by the State as important agricultural lands needed to fulfill the purposes *above* shall not be reclassified by

the State or rezoned by its political subdivisions without meeting *the standards and criteria established by the legislature and approved by a two-thirds vote of the body responsible for the reclassification or rezoning action.*

(Emphases added.) Emphasizing the words "approved by a two-thirds vote of the body responsible[,]" Plaintiffs argue that court erred in holding that bill number 88 was approved.[20] We review questions of constitutional law *de novo*, under a right/wrong standard. *United Public Workers Local 646 v. Yogi*, 101 Hawai'i 46, 49, 62 P.3d 189, 192 (2002) (citing *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213, *reconsideration denied*, 91 Hawai'i 372, 984 P.2d 1198 (1999)). Also,

> [i]n interpreting a constitutional provision, *"the words of the constitution are presumed to be used in their natural sense* ... 'unless the context furnishes some ground to control, qualify or enlarge (them).'" *State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 577, 545 P.2d 1175, 1182 (1976) (citation omitted).
>
> "We have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional principle is to give effect to that intent." *Convention Center Auth. v. Anzai*, 78 Hawai'i 157, 167, 890 P.2d 1197, 1207 (1995). *"This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument."* *State v. Kahlbaun*, 64 Haw. 197, 201, 638 P.2d 309, 314, *recon. denied*, 64 Haw. 197, 638 P.2d 309 (1981) (citations omitted).

*Id.* at 192–93, 62 P.3d at 192–93 (emphases added).

### A.

▮ In upholding the City Council vote, the court held that the two-thirds vote man-

---

**20.** Conclusion number 5, *see supra* note 19, ruled that bill number 88 did not violate Article XI, Section 3 of the Hawai'i State Constitution.

date was not operative because Article XI, section 3 was not self-executing and legislation necessary to implement it had not been adopted. In *State v. Rodrigues*, 63 Haw. 412, 414, 629 P.2d 1111, 1113 (1981), this court established that a constitutional provision is self-executing when it establishes "a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced[.]" (quoting *Davis v. Burke*, 179 U.S. 399, 403, 21 S.Ct. 210, 45 L.Ed. 249 (1900)). Conversely, a provision is not self-executing when it "merely indicates principles, without laying down rules by means of which those principles may be given the force of law." *Id.*

In *Rodrigues*, three defendants were indicted by grand juries. None of the juries were assigned an independent counsel to advise it. 63 Haw. at 413–14, 629 P.2d at 1112–13. The defendants were convicted, and their appeals were consolidated. Defendants maintained that Article I, section 11 of the Hawai'i State Constitution, which provided that "[w]henever a grand jury is impaneled, there shall be an independent counsel appointed *as provided by law* to advise the members of the grand jury regarding matters brought before it" (emphasis added), was self-executing, and, thus, their indictments were obtained in violation of this provision, and should be dismissed, *Rodrigues*, 63 Haw. at 414, 629 P.2d at 1113.

On appeal, this court determined that Article I, section 11 was not self-executing. *Id.* at 416, 629 P.2d at 1115. It was held that the mere adoption of the constitutional amendment creating the position of the independent counsel was not sufficient, but that further legislative action was necessary to implement it. *Id.* at 415, 629 P.2d at 1115. Therefore, *Rodrigues* concluded that, until such legislation was enacted, the presence of the independent grand jury counsel in grand jury proceedings was not required. *Id.* at 416, 629 P.2d at 1114–15. Consequently, this court concluded that Article I, Section 11 of the Hawai'i Constitution was not effective as to any defendant, and the trial court's denial of the motion to dismiss was proper. *Id.* at 418, 629 P.2d at 1115; *see also State v.*

*Pendergrass*, 63 Haw. 633, 634, 633 P.2d 1113, 1114–15 (1981) (discussing *State v. Rodrigues* in connection with the principle that "the mere adoption of the constitutional amendment ... was not enough to make the provision operative.... [F]urther legislative action was necessary to implement this constitutional provision").

### B.

Read as a whole, Article III, Section 3 calls for future action to be taken by the legislature. The first sentence of section 3 sets out a mandate with respect to the preservation of agricultural lands. The text then imposes a duty on the legislature to "provide standards and criteria to accomplish the foregoing [mandate]." The directive to "provide standards and criteria" indicates a duty arising on the effective date of the provision. Indeed, Plaintiffs concede the duty to provide such standards relates to future action. Because the provision calls for future action it negates the inference that any standards then in existence were incorporated by the amendment.

The last sentence of Section 3 confirms that the identification of important lands was to *follow* the adoption by the legislature of such standards. According to that sentence, such identification was necessary "to fulfill the purposes [described] *above* [.]" The word "above" refers to the mandate contained in the first sentence that is imposed prospectively. Hence, the sentence signals that identification was to be accomplished in the future. Also, the last sentence instructs that reclassification or rezoning of the "lands identified" "shall not" occur "without meeting the standards and criteria established by the legislature[.]" Plainly this means the "standard and criteria" in the second sentence were to be adopted by the legislature after the amendment became effective.

Pursuant to the directive to designate "important agricultural lands[,]" the legislature in 1983 passed Act 273 to establish a "land evaluation" commission to "identify, develop, and recommend for legislative adoption important agricultural lands."[21] The purpose

---

**21.** Act 273 stated, in pertinent part:

SECTION 2 **State of Hawai'i land evalua-**

of Act 273 was "to establish an independent agricultural land study commission to advise the Legislature in the development of an agricultural land classification system for identifying important agricultural lands pursuant to Article XI, section 3 of the Hawai'i Constitution." Hse. Stand. Comm. Rpt. No. 326, in 1983 Hse. Journal, at 980. It is undisputed that the commission made recommendations, but that the legislature failed to act upon them. *See infra* part VII. The legislature has made no other significant efforts to satisfy its assigned duty since the adoption of Article XI, section 3. Thus, no "standards and criteria" have been enacted after the effective date of section 3.

As was the case with another constitutional provision in *Rodrigues,* Article XI, Section 3 requires legislative action to become operative. The nature of the required legislative action, at the least, was the adoption of standards and criteria. Because section 3 is not "complete in itself," *see Davis v. Burke,* 179 U.S. at 403, 21 S.Ct. 210 ("[w]here a constitutional provision is complete in itself[,] it needs no further legislation to put it in force"), it requires implementing legislation. Hence, the framers appear to have required that "standards and criteria" be adopted by the legislature before the second paragraph relating to a two-thirds vote becomes operative.[22]

### V.

■ Plaintiff's third argument on appeal is that no lands could be reclassified without the legislatively defined "standards and criteria" referred to in Article XI, section 3. For the reasons recounted in part IV. above, this argument is unavailing. Inasmuch as the

provision is not self-executing, it has no effect and does not act as a barrier to reclassification.

In adopting Act 274 in 1983, the legislature was aware that while the land evaluation commission conducted its study to make recommendations, "prime agricultural lands maybe [sic] taken out of agricultural uses for other development before the legislature can intelligently adopt a studied plan for agricultural lands." Hse. Stand. Comm. No. 454, in 1983 House Journal, at 1041. In order to combat this potential problem, the legislature "appeal[ed] to the land use commission and the county planning and zoning bodies to be cognizant of the importance placed upon prime and important agricultural lands" and urged such bodies "to comply fully with the intent of the State Constitution ... and the spirit in which this bill is recommended." *Id.*

The legislature reiterated that "faithful adherence to present state constitutional provisions for agricultural land classification or zoning, statutory protection and promotion of agriculture, and regulatory identification of important agricultural land will substantially prevent such inappropriate and excessive conversion of agricultural land to other uses." Conf. Comm. Rpt. No. 43, in 1983 House Journal, at 800.

Although it is evident that Article XI, section 3 evinced the concern that agricultural lands were not being adequately protected, that concern did not abrogate the requirement that the legislature establish standards and criteria for the preservation of agricultural lands. Until such standards are adopted, the section is legally inoperative. As a consequence, the Lihi Lani lands could be rezoned without a two-thirds majority

tion and site assessment commission....

(b) Purpose and operation. The commission shall identify, develop, and recommend for legislative adoption important agricultural lands pursuant to the land classification system specified in subsection (d)....

....

(d) State of Hawai'i land evaluation and site assessment. The commission shall formulate the State of Hawai'i land evaluation and site assessment system in identifying agricultural lands of importance to the State of Hawai'i. In the formulation of the system, the commission shall take into consideration existing data provided by previous studies done under the

Land Study Bureau and appropriate attributes of the Land Study Bureau's Detailed Land Classification system and the Agricultural Lands of Importance to the State of Hawai'i system....

22. Although we observe that Article XVI, section 16 states that: "The provisions of this constitution shall be self-executing *to the fullest extent that their respective natures permit* [,]" (emphasis added), we believe that the clear reference to further legislative action dictates that section 3 is not self-executing.

vote of the City Council. Accordingly the court was correct in ruling in conclusion of law number 6 that the passage of bill number 88 did not violate Article XI, Section 3 of the Hawai'i State Constitution. *See supra* note 16.

## VI.

■ Plaintiffs' fourth argument is that the provisions of Article XI, section 3 were executed when the amendment was adopted in 1978, because the drafters intended to adopt soil and land designation standards in existence at the time. In 1977, the United States Department of Agriculture Soil Conservation Service and the University of Hawai'i Agriculture Experiment Station conducted and published a study designating and mapping various agricultural lands within the State as "Agricultural Lands of Importance to the State of Hawai'i" (ALISH). The intent of this program was to identify "agriculturally important lands" so as to "provide ... decision makers with a valuable tool for use in agricultural preservation, planning and development[.]" It is undisputed that land in the Lihi Land project was designated as "important" under the ALISH system.[23]

### A.

The first proposed version of Article XI, section 3 included ALISH-like language. However, amendments deleted such language and added other text. The final version read as follows [24] (the bracketed section was to be deleted, while the underlined section was revised or added):

> The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency, and assure the availability of agriculturally suitable lands. <u>The legislature shall enact laws that will set forth standards and criteria applicable to accomplish the forgoing.</u>
>
> [Reclassification of lands identified by the State as 'prime', 'unique', or 'other important' agricultural lands in agricultural districts shall be subject to approval by two thirds of each house of the legislature. These lands shall be protected and maintained for bona fide agricultural use. Necessary support facilities are permissible.] <u>Land identified by the State as important agricultural lands needed to fulfill the purposes above shall not be reclassified by the State or rezoned by its political subdivisions without meeting the standards and criteria established by the legislature and approved by a two-thirds vote of the body responsible for the reclassification or rezoning action.</u>

(Emphases added.) Deletion of the words "prime," "unique," or "other important" lands demonstrates the convention's decision to abandon the ALISH identification system as the controlling classification scheme.[25]

---

**23.** There is some dispute over the exact amount of land designated on Obayashi's property as "important" under the ALISH system. This fact is immaterial to the resolution of the issue, however, inasmuch as we conclude that the ALISH system was not incorporated into Article XI, section 3. *See infra.* Accordingly, we do not need to reach the question of whether finding number 50, relating to the amount of land designated as "important" under the ALISH system, is in error. *See supra* note 19.

**24.** Amendment No.9 amended section 6 of Com. P. No. 17, RD. 1, to read as stated above.

**25.** The City contends that drafters intentionally omitted the use of ALISH terminology as the basis for determining "important agricultural lands." The City refers to testimony of several members of the constitutional convention as evidence that the ALISH-like original language was intentionally omitted. For example, during debates on the proposed amendment Delegate Harris stated that:

> As one whose strong platform is the preservation of agricultural land, I can honestly tell you that I would perhaps prefer something much stronger but *I belief this is a reasonable compromise.* This I think addresses the problem, while at the same time not being overly restrictive. I urge this delegation to unanimously support this very important proposal.

*Proceedings of the Constitutional Convention of Hawai'i of 1978,* Volume 1, Journal and Documents, at 441 (1980) (hereinafter *Proceedings* ) (emphasis added). Similarly, Delegate Hornick submitted written testimony to the following:

> Com. P. No. 17 attempted to deal with these problems by identifying the best agricultural lands and imposing a heavy requirement for their reclassification-two-thirds vote of the legislature. However, several concerns have since been raised-to the effect that this requirement is too burdensome and a compromise is

### B.

In response, Plaintiffs contend that the change to section 3 "merely removed the more specific, technical language ('prime', 'unique', and 'other') and substituted the more general but equally dispositive language 'identified by the state as important.'" Plaintiffs argue that this "is a common method of revision to make a proposed constitutional amendment clearer and to avoid confusing voters with technical language."

We must disagree with this interpretation of the change in language in section 3. There is nothing in the final version of the amendment to indicate that the framers meant to incorporate the ALISH classification system in the constitution. If the framers had intended ALISH to be applied, then they could have simply adopted the first draft of the amendment that included ALISH language. Instead, the convention inserted different words which encompassed the more general designation of "important agricultural lands." It further commanded that the *legislature* promulgate "standards and criteria," presumably altering the emphasis on the ALISH standards contained in the original proposal. Were the ALISH system to be incorporated to the exclusion of all others, it would not have been necessary to direct the legislature to adopt standards.

In a similar situation, this court considered the intent of the legislature in *Maha'ulepu v. Land Use Commission*, 71 Haw. 332, 790 P.2d 906 (1990) and concluded that if the delegates had intended to adopt ALISH at the 1978 Constitutional Convention, they would have expressly done so at that time. We believe that if the legislature had intended absolute protection from golf course uses for A and B rated agricultural

---

needed, that will reemphasize the need for preserving our agricultural lands and increase LUC accountability while still allowing for the weighing of other social needs.

This amendment fits those criteria. It combines the original strong policy statement with a mechanism by which the community can require more LUC compliance with the intent of the land use law, by requiring two-thirds vote of the LUC for reclassification and the city or county council for rezoning.

I personally prefer stronger protection for the best agricultural lands, but *I do feel that*

---

lands, it would have done so unequivocally by prohibiting the issuance of permits for golf courses under the special permit provisions ... or by employing clearly prohibitory language ... Because the amendment ... merely reiterated the provisions of § 205-4.5, which provided authority for special permits for golf course uses on A and B rated lands, § 205-2 cannot be construed as an outright prohibition on such permits.

*Id.* at 338–39, 790 P.2d at 910.

In light of the foregoing, the word "important" can only be viewed in its common and usual sense. As noted earlier, "the words of the constitution are presumed to be used in their natural sense ... 'unless the context furnishes some ground to control, qualify or enlarge them.'" *State ex rel. Amemiya*, 56 Haw. at 577, 545 P.2d at 1182 (citation and internal brackets omitted) (emphasis added). The common and ordinary meaning of the word "important," rather than its technical, shorthand use in the ALISH system, would be consistent with the meaning of the term in light of the foregoing.

### VII.

■ Plaintiffs' fifth argument on appeal is that a country district can not be established on state agricultural lands unless, pursuant to ROH § 21-5.30, four guidelines used to identify lands for country designation were met. As stated earlier, ROH § 21-5.30(c) enumerates four guidelines for identifying potential country district lands. *See supra* note 5. Plaintiffs argue that the guidelines are mandatory, and because not all four guidelines were met, the Lihi Lani lands could not be rezoned as a country district.

---

*this amendment is a workable compromise* and a positive step in the right direction. I urge its adoption.

*Proceedings, supra,* at 443 (emphasis added). Thus the City argues that "the only material pertinent to the deletion of ALISH as the touchstone [to the amendment] appears to be that its use as such would be too burdensome, and that the 'identification' needed to achieve the Convention's purpose should be *preceded* by the adoption of standards and criteria adopted by the Legislature." (Emphasis in original.)

We conclude that "use" or consideration of the four guidelines expressed in ROH § 21–5.30(c) are mandatory, but that the ultimate designation decision arising out of that mandatory consideration must, of necessity, involve the exercise of discretion. The use of the terms "shall" and "identify" appear to indicate that the guidelines must be utilized in the consideration of specific lands for rezoning as a country district. Such consideration, however, involves the application of "guidelines." The plain and ordinary meaning of the term "guideline" is "an indication or outline of future policy or conduct (as of a government)." *Webster's Third New Int'l Dictionary* 1009 (1961). *See also Grievance Adm'r v. Underwood*, 462 Mich. 188, 194, 612 N.W.2d 116 (2000) ("The plain meaning of 'guideline' is 'an indication or outline of policy or conduct.'" (Citations omitted.)); *Tutein v. Daley*, 43 F.Supp.2d 113, 121 n. 14 (D.Mass.1999) (defining " 'guideline' as 'any guide or indication of future action' " (citation omitted)). Hence, "guidelines[,]" as defined in ROH § 21–5.30, denote individual factors that are not mandatory in themselves, but instead provide direction or guidance with respect to the ultimate decision to rezone. Any rezoning to country, then must, pursuant to ROH § 21–5.30, include consideration of the guidelines. But because guidelines presuppose the exercise of discretion, the failure to satisfy all of them cannot be said to preclude identification of land as "country."

Therefore, the City Council must apply all the guidelines, but it is not restricted in approving a rezoning application that does not satisfy all four of them. In the instant case, the Department of Land Utilization determined that the Lihi Lani project satisfied two of the four guidelines, namely that the land being zoned to "Country" was not predominantly classified as prime, unique, or other lands of agricultural importance, and the existing public facility capacities would preclude intense development on the land. Accordingly, the court did not err in making finding number 61 to the effect that all four guidelines need not be satisfied.[26]

## VIII.

Plaintiffs' sixth argument is that the City's country zoning designation conflicts with HRS chapter 205, because the uses allowed in a country district exceed those permitted within the state agricultural district. In rebuttal, Obayashi contends that Plaintiffs are barred from arguing that the project fails to comply with HRS chapter 205 because they did not object to the court's dismissal of counts II and III of Plaintiffs' complaint, which alleged, respectively, that (1) the proposed uses of the property do not qualify as a permissible agricultural use under HRS chapter 205, and (2) that the property will not be used primarily for agricultural purposes. Obayashi argues, however, that country zoning in this case is not inconsistent with HRS chapter 205, because chapter 205 permits "farm dwellings," and the dwellings planned are "farm dwellings" within the definition of HRS chapter 205.[27]

■ The City agrees that Plaintiffs should be barred from arguing that County zoning conflicts with state agricultural zoning because Plaintiffs did not appeal the dismissal of the counts related to this issue. In addition, the City maintains: (1) that it has "concurrent jurisdiction" with the State in agricultural districts; (2) it is empowered to enact any type of zoning as long as the zoning complies with the "long-range, comprehensive, general plan" requirement of HRS § 46–4;[28] (3) it has the authority, pur-

---

**26.** Finding number 61 stated:

Although the guidelines were factors the City was required to consider in determining whether to rezone the 765 acres to County, ROH § 21–5.30 did not require that all four of the guidelines must be met, or preclude Country zoning for lands that satisfy less than four of the guidelines.

*See supra* note 16.

**27.** HRS § 205–4.5(a)(4) (2001) defines "farm dwelling" as "a single-family dwelling located on and used in connection with a farm, including clusters of single-family farm dwellings permitted within agricultural parks developed by the State, or where agricultural activity provides income to the family occupying the dwelling[.]"

**28.** HRS § 46–4 provides that:

*Zoning in all counties shall be accomplished within the framework of a long range, comprehensive general plan* prepared or being prepared to guide the overall future development of the county. *Zoning shall be one of the tools*

suant to HRS § 205–6 (2001),[29] to "permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified[;]" (4) it is charged with the "administration of county zoning laws" and "the restriction[s] on use and the condition[s] relating to agricultural districts under section 205–4.5[,]" HRS § 205–12 (2001), and thus it will resolve permissible uses in an agricultural district at the time of permitting; and (5) as to any incompatibilities between uses authorized in country zoning and in agricultural districts, only uses authorized by HRS chapter 205 can occur even if a country designation would ordinarily permit greater uses.

Count VI of the Plaintiffs's complaint raised the specific question of whether the City could zone land as country in a state-designated agricultural district.[30] That count requested a declaratory judgment that the City could not rezone agricultural district lands as country, injunctive relief preventing Obayashi from beginning construction or development in a country zone, and injunctive

relief enjoining the City from approving any use that is not permitted in an agricultural district. In addressing this count, the court found in finding number 64 that "Plaintiffs have not demonstrated nor is the evidence sufficient to show that the zoning change from Agriculture to Country was inconsistent with or violated the provisions of Chapter 205, HRS." Plaintiffs did assign error to this finding on appeal. Thus, Plaintiffs are not precluded from arguing this issue.

## IX.

 Initially we note that it is fundamental that authority to zone is conferred by the legislature on the counties. *See Kaiser Hawai'i Kai Dev. Co. v. City & County of Honolulu,* 70 Haw. 480, 483, 777 P.2d 244, 246 (1989) ("The counties of our state derive their zoning powers from HRS § 46–4(a) (Supp.1988), referred to as the Zoning Enabling Act."). However, counties are authorized to zone *only* according to the dictates of HRS § 46–4 subject to limitations within HRS chapter 205.[31] *See* HRS § 205–5(a)

*available to the county to put the general plan into effect in an orderly manner . . . .* In establishing or regulating the districts, full consideration shall be given to all available data as to soil classification and physical use capabilities of the land so as to allow and encourage the most beneficial use of the land consonant with good zoning practices. The zoning power granted herein shall be exercised by ordinance which may relate to:
(1) The areas within which agriculture, forestry, industry, trade, and business may be conducted.
(2) The areas in which residential uses may be regulated or prohibited.
. . . .
(4) The areas in which particular uses may be subjected to special restrictions.
(5) The location of buildings and structures designed for specific uses and designation of uses for which buildings and structures may not be used or altered.
. . . .
(12) Other such regulations as may be deemed by the boards or city council as necessary and proper to permit and encourage orderly development of land resources within their jurisdictions.
. . . .
*The powers granted herein shall be liberally construed in favor of the county exercising them, and in such a manner as to promote the orderly development of each county or city and county in accord with a long range, comprehen-*

*sive, general plan, and to insure the greatest benefit for the State as a whole.*
(Emphases added.).

29. HRS § 205–6 provides that:

*The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified.* Any person who desires to use the person's land within an agricultural or rural district other than for an *agricultural or rural use, as the case may be,* may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired.

30. Among other things, Plaintiffs alleged in Count VI that "[t]he stated purpose of 'Country' zoning to provide for low density residential uses is inconsistent with the permissible uses and purposes of the State-designated 'Agricultural' district."

31. HRS § 46–1.5 states, in pertinent part:

Subject to general law, each county shall have the following powers and shall be subject to the following liabilities and limitations:
. . . .
(13) Each county shall have the power to enact ordinances deemed necessary to protect health, life, and property, and to preserve the order and security of the county and its inhab-

("Except as herein provided, the powers granted to counties under section 46-4 shall govern the zoning within the districts,[32] other than in conservation districts.") Because the provisions in HRS chapter 205 are "law[s] of statewide concern," *see Kaiser Hawai'i Kai Dev.*, 70 Haw. at 489, 777 P.2d at 249, and HRS § 46-4 does not relate to the City's "executive, legislative[,] and administrative structure and organization[,]" *id.* at 489, 777 P.2d at 250, the State's districting scheme prevails over the City's land use ordinance. Thus, any conflict between the State provisions and the county zoning ordinances is resolved in favor of the State statutes, by virtue of the supremacy provisions in article VIII, section 6 of the Hawai'i Constitution[33] and HRS § 50-15.[34]

> Thus, if an ordinance *truly conflicts* with Hawai'i statutory law that is of statewide concern, then it is necessarily invalid because it violates article VIII, section 6 of the Hawai'i Constitution and HRS §§ 50-15—the state's supremacy provisions. A law of general application throughout the state[ ] is a law of statewide concern within the meaning of article VIII, section 6[ ] of the Hawai'i ... Constitution. *Marsland [v. First Hawaiian Bank]*, 70 Haw. [126,] 133, 764 P.2d [1228,] 1232 [ (1988) ].

*Richardson v. City & County of Honolulu*, 76 Hawai'i 46, 66, 868 P.2d 1193, 1213 (1994) (emphasis added; internal quotation marks omitted). Consequently, while the City's contention that its zoning authority is "concurrent" is somewhat true, any zoning ordinance enacted by the City may not actually conflict with the provisions in HRS chapter 205. Otherwise, the City is not authorized to so zone, and HRS § 50-15 requires that we

invalidate the ordinance. *See Richardson*, 76 Hawai'i at 66, 868 P.2d at 1213.

## X.

The dual state and county land use designation approach is analogous to the requirement that property owners comply with both the county development plans and zoning ordinances. In *GATRI v. Blane*, 88 Hawai'i 108, 962 P.2d 367 (1998), this court addressed the consistency required between development plans and county-enacted zoning ordinances, both of which have the force and effect of law. *Id.* at 109, 962 P.2d at 368. In *GATRI*, a general partnership (*GATRI*), desired to build a snack bar on a parcel of land which was zoned for B-R Resort Commercial (allowing for construction of the snack shop), although the development plan called for single family (SF) use (not allowing for construction of the snack shop). *Id.* at 109, 962 P.2d at 368.

When the developer submitted a SMA permit application to the Maui County Planning Commission, the permit was denied, because, although the county zoning designation was proper, the snack shop was inconsistent with the county general plan. *Id.* at 109-10, 962 P.2d at 368-69. On appeal to the circuit court, GATRI argued that the decision of the Director of the Commission was erroneous because a development which is consistent with the governing zoning ordinance is *per se* consistent with the development plan, and thus, GATRI was entitled to the expanded list of uses permitted under the zoning ordinance, rather than the more restricted uses permitted under the development plan. *Id.* at 110, 962 P.2d at 369.

The circuit court issued a judgment in favor of GATRI, which the Director appeal-

itants on any subject or matter *not inconsistent with, or tending to defeat, the intent of any state statute,* provided also that the statute does not disclose an express or implied intent that the statute shall be exclusive or uniform throughout the State. (Emphasis added.).

32. The term "districts" is defined in *supra* note 1.

33. Article VIII, section 6 states "This article shall not limit the power of the legislature to enact laws of statewide concern."

34. HRS § 50-15 states:

> Notwithstanding the provisions of this chapter, there is expressly reserved to the state legislature the power to enact all laws of general application throughout the State on matters of concern and interest and laws relating to the fiscal powers of the counties, and *neither a charter nor ordinances adopted under a charter shall be in conflict therewith.* (Emphasis added.).

ed. *Id.* at 110, 962 P.2d at 369. In reviewing the appeal, this court determined that, because the development plan had the force and effect of law, "the development must be consistent with both the [development] plan and the zoning." *Id.* at 115, 962 P.2d at 374. Because GATRI was subject to both the development plan as well as the zoning ordinance, GATRI was entitled only to the more restricted uses allowed by the development plan. *See id.*

In Hawai'i's land use system the legislature's statutory districts constitute more of a general scheme, and, presumably, by delegating .authority to zone to the counties, the legislature intended that specific zoning be enacted at the county level. We believe that the "consistency doctrine" enunciated in *Gatri* is somewhat instructive in the instant case. Because the uses allowed in country zoning, are prohibited from conflicting with the uses allowed in a State agriculture district, only a more restricted use as between the two is authorized. By adopting a dual land use designation approach, the legislature envisioned that the counties would enact zoning ordinances that were somewhat different from, but not inconsistent with, the statutes.

## XI.

While the counties are empowered to enact zoning ordinances, HRS chapter 205 clearly limits the permissible uses allowed within an agricultural district. HRS § 205–4.5(b) states that "[u]ses not expressly permitted in subsection (a) *shall be prohibited*, except the uses permitted as provided in sections 205–6 and 205–8[.]" (Emphasis added.) Thus, any use permitted by a country designation not expressly permitted in HRS § 205–4.5(a) or by virtue of HRS §§ 205–6 or 205–8 (2001)[35] conflicts with the statutory regime.

 HRS § 205–6 provides that:

*The county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the dis-*

*trict is classified.* Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired.

(Emphasis added.) However, we observe that the "reasonable and unusual" exception permitted by HRS § 205–6 cannot be utilized to circumvent the essential purpose of the agricultural district. In *Curtis*, 90 Hawai'i at 397, 978 P.2d at 835, this court held that the "essential purpose [of HRS § 205–6] . . . is to provide landowners relief *in exceptional situations where the use desired would not change the essential character of the district nor be inconsistent therewith.*" *Id.* (emphasis added) (citing *Neighborhood Board No. 24 (Waianae Coast) v. State Land Use Comm'n*, 64 Haw. 265, 639 P.2d 1097 (1982)). Accordingly, while a landowner may request a permit for a use allowed by the country designation but prohibited in an agricultural district, such a permit is appropriate only in an "exceptional situation" that does not contravene the general purpose of an agricultural district. We have also concluded that an ordinance authorizing a zoning use more restrictive than that permitted under the statutory district, would not conflict with such a regime and thus is permissible. *See* discussion *supra.*

## XII.

 Plaintiffs argue that a permitted use under the City's county district exceeds the state agricultural district because it allows the use of a "dwelling, detached, one-family[,]" and requires no special permit for such use. HRS § 205–4.5(a)(4) limits dwelling use to "[f]arm dwellings, employee housing, farm buildings, or activity or uses related to farming and animal husbandry[.]"

But in the instant case it is not evident that the development would conflict with the most restrictive use as between country zoning and the agricultural district. As noted

35. HRS § 205–8, which permits any "lawful use of land or buildings existing on the date of establishment of any interim agricultural district and

rural district in final form[,]" is not relevant here.

above, Obayashi contends that its development will fit within the permitted uses of an agricultural district.[36] Moreover, *Obayashi* does not indicate it seeks a special permit for "reasonable and unusual" uses under HRS § 205–6. As previously indicated, the City takes the position that issues as to the residential nature of the development "will be presented only at the time actual uses are proposed" and "permits are sought." Also, the City generally maintains that at the time of permitting or enforcement only the most restrictive uses would be authorized.

◼ Under the ripeness doctrine, a court should "reserve judgment upon a law pending concrete executive action to carry its policies into effect[.]" *Bremner v. City & County of Honolulu,* 96 Hawai'i 134, 144, 28 P.3d 350, 360 (App.2001), *reconsideration denied,* (July 5, 2001), *certiorari denied,* (Aug. 13, 2001). On somewhat analogous grounds, this court has explained the principles of the ripeness doctrine in relation to administrative decisions, as follows:

> The need to avoid premature adjudication supports a definition of "dispute" that requires more than a "difference of opinion" as to policy. The rationale underlying the ripeness doctrine and the traditional reluctance of courts to apply injunctive and declaratory remedies to administrative determinations is "to prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effect felt in a concrete way by the challenging parties."

*Grace Bus. Dev. Corp. v. Kamikawa,* 92 Hawai'i 608, 612, 994 P.2d 540, 544 (2000) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also League of Women Voters of Hawai'i v. Doi,* 57 Haw. 213, 214, 552 P.2d 1392, 1393

(1976) (explaining, in relation to a request for a declaratory judgment, that this court was reluctant to "decide important questions regarding 'the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case[.]' " (Citation omitted.)). Thus, "[p]rudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society, considerations flowing from our coequal and coexistent system of government, dictate that we accord those charged with drafting and administering our laws a reasonable opportunity to craft and enforce them in a manner that produces a lawful result." *Bremner,* 96 Hawai'i at 144, 28 P.3d at 360 (internal citations, brackets and quotation marks omitted) (citing *Life of the Land,* 63 Haw. 166, 172, 623 P.2d 431, 438 (1981)).

In this case, Obayashi claims it will comply with HRS chapter 205. The City represents that it will enforce the appropriate statutes and ordinances and allow only the most restrictive use of the land in the event of a conflict. Under these circumstances, we affirm the court's grant of summary judgment on Count VI but on the ground that Count VI is not ripe for decision.[37] *See Enos v. Pacific Transfer & Warehouse, Inc.,* 79 Hawai'i 452, 459, 903 P.2d 1273, 1280 (1995), *reconsideration denied* (Oct. 16, 1995) (noting that "it is well-settled that '[a]n appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance' ") (Quoting *Strouss v. Simmons,* 66 Haw. 32, 40, 657 P.2d 1004, 1010 (1982) (citations omitted)). This should not, however, bar Plaintiffs from raising this issue again as may be appropriate. *See, e.g., The Skull Valley Band of Goshute Indians v. Leavitt,* 215 F.Supp.2d 1232, 1252 (D.Utah 2002) (noting that a determination of ripeness is final, "absent a change in factual circumstances relating to the ripeness issue") (citing *Solar v. Merit Sys. Protection Bd.,*

---

**36.** Obayashi argues that the specific plans of the Lihi Lani project fall under the definition of a "farm dwelling." However, the court held that this issue was premature as Obayashi has yet to submit a formal development plan or request a final agency action on the proposed development. Plaintiffs have not appealed this determination and thus we do not reach Obayashi's contentions.

**37.** In conclusion number 6, *see supra* note 19, the court held that "Plaintiffs have not demonstrated nor does the evidence show that these measures or procedures were inconsistent with and/or violated ... HRS Chapter 205[.]"

600 F.Supp. 535, 536 (S.D.Fla.1984)); *Johnston Ambulatory Surgical Assocs., Ltd. v. Nolan,* 755 A.2d 799, 813 (R.I.2000) (noting that a "change in material circumstances" prevented application of *res judicata* to a previously made ripeness decision).

## XIII.

 Plaintiffs' remaining issue on appeal concerns the court's protective order of a memorandum prepared by Obayashi's attorneys, and transmitted to an expert witness who listed it as a reference in a publicly issued EIS.[38] We review a trial court's ruling on a motion to compel discovery under an abuse of discretion standard. *See, e.g., Hac v. University of Hawai'i,* 102 Hawai'i 92, 100–01, 73 P.3d 46, 54–55 (2003) (citations omitted). "An abuse of discretion occurs when the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citations omitted).

### A.

 As a preliminary matter, it is necessary to distinguish between the attorney-client and the work-product privileges. The attorney-client privilege is codified in the Hawai'i Rules of Evidence (HRE) Rule 503, which provides that a client "has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client[.]" HRE Rule 503(b); *see also DiCenzo v. Izawa,* 68 Haw. 528, 535, 723 P.2d 171, 175 (1986) (noting that prior to codification, the "common-law attorney-client privilege [has been] long recognized by the courts of Hawai'i"). The underlying principle of this privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice[.]" *State v. Wong,* 97 Hawai'i 512, 518, 40 P.3d 914, 920 (2002) (quoting *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)); *see also DiCenzo,* 68 Haw. at 535, 723 P.2d at 175 (explaining that "lawyers can act effectively only if they are fully advised of the facts by the parties they represent and disclosure will be promoted if the client knows that what he tells his lawyer cannot be extorted from the lawyer" (internal quotation marks, brackets, and ellipses omitted)).

On the other hand, the work-product privilege has its foundation in HRCP Rule 26,[39] which states that parties "may obtain discovery regarding any matter, *not privileged,*" (emphasis added), and indicates that "discovery of documents and tangible things ... prepared in anticipation of litigation or for trial" shall be disclosed only upon a showing of "substantial need of the materials" and "undue hardship" in obtaining the materials in another fashion. HRCP Rule 26(b)(3). Further, "[i]n ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." HRCP Rule 26(b)(3).

 Although Obayashi repeatedly states that the memorandum contains "legal analysis, legal impressions and legal conclusions" there is no indication that it was prepared in anticipation of litigation. We must conclude then that the work-product privilege is inapplicable.[40]

### B.

 To come within the attorney-client privilege, the communication must be a "confidential communication made for the purpose of facilitating the rendition of professional legal services" between appropriate

---

38. The City takes "no position" on the issue of the protective order.

39. The work product doctrine was largely articulated by the United States Supreme Court in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). That Court held that without a showing of necessity, most "written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties" were not otherwise discoverable. *Id.* at 510, 67 S.Ct. 385.

40. We acknowledge the controversy over whether materials given to a testifying expert witness are discoverable, even if these materials may otherwise fall under the work-product privilege. The genesis of this controversy rests upon the language of the Federal Rules of Civil Procedure

parties as stated in HRE Rule 503(b). Accordingly, a communication occurring in the following manner is privileged:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his [or her] capacity as such, (3) the communication relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [or her] instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Sapp v. Wong*, 62 Haw. 34, 38, 609 P.2d 137, 140 (1980) (quoting 8 Wigmore, Evidence, § 2292 (McNaughton rev.1961)). However, as in *Sapp*, a reviewing court may determine that under the circumstances of the case that there was an invocation of the privilege. *See Sapp*, 62 Haw. at 39, 609 P.2d at 141 ("We, however, go farther than deciding that the proper determinations were not made. Under the circumstances of this case, ... [the comments] fall within the ambit of the privilege[.]"). Here, it was apparent that the memorandum was prepared on behalf of a representative of Obayashi in an effort to ensure that the proposed development met all applicable laws and Obayashi's needs. As such, the allegations sufficiently met the requirement that the memorandum was a confidential communication made for the purpose of facilitating the rendition of a legal service for Obayashi between Obayashi's representative and a lawyer. HRE Rule 503(b). As such, we conclude that it was not an abuse of discretion to determine that the memorandum was privileged.

## XIV.

Plaintiffs assert that the disclosure of the memorandum to an expert witness and the subsequent citation to the memorandum in a

---

(FRCP) Rule 23(b)(3), upon which the HRCP are based upon. FRCP rule 23(b)(3) implies that in the interest of broad discovery of information regarding a testifying expert witness, all materials provided to such a witness including items protected by the work-product rule, are discoverable. *See* D. Oishi, *A Piece of Mind for Peace of Mind: Federal Discoverability of Opinion Work Product Provided to Expert Witnesses and its Implications in Hawai'i*, 24 U. Haw. L.Rev. 859, 884–85 (2002) (observing the current split among the circuits and recommending that Hawai'i "adopt the bright-line rule" of requiring discovery); *see also Bogosian v. Gulf Oil Corp.*, 738

---

public document waived any privilege. HRE Rule 511 governs the waiver of privilege through a "voluntary" disclosure, and states:

> A person upon whom these rules confer a privilege against disclosure waives the privilege if, while holder of the privilege, *the person or the person's predecessor voluntarily discloses or consents to disclosure of any significant part of the privileged matter.* This rule does not apply if the disclosure itself is a privileged communication.

HRE Rule 511 (emphasis added). The commentary to this rule explains that "[a]ny intentional disclosure by the holder of the privilege defeats [the purpose of the privilege] and eliminates the necessity for the privilege in that instance." Thus, a waiver analysis would focus on whether the disclosure was voluntary. *Cf. Territory v. Cabrinha*, 24 Haw. 621, 626 (1919) (expressing that "[i]n all cases where a personal privilege exists for a witness to testify or not, if such witness does testify without objection he will be deemed to have done so voluntarily" (citation omitted)); *Takamori v. Kanai*, 11 Haw. 1, 2 (1897) (holding that the act of "voluntarily" putting defendant's counsel on the witness stand waived the claim of privileged communication).

## XV.

The effect of an inadvertent disclosure of information upon the attorney-client privilege has not been decided in this jurisdiction. It appears that there is no consensus among other jurisdictions as to whether an inadvertent disclosure constitutes a voluntary or intentional disclosure. *See, generally*, J. Hundley, *Waiver of Evidentiary Privilege by Inadvertent Disclosure—State Law*, 51 A.L.R. 5th 603, 634, 1998 WL 2606 (1997)

---

F.2d 587, 594 (3rd Cir.1984) (analyzing identical language to HRCP Rule 26 and concluding that the work product privilege rule is not subscribed by FRCP Rule 26(b)(4)); *Intermedics, Inc. v. Ventritex, Inc.*, 139 F.R.D. 384, 390 (N.D.Cal.1991) (rejecting *Bogosian* and concluding that the drafters of the rules desired to allow a "fair opportunity to expose whatever weaknesses, unreliabilities, or biases [that] might infect the opinions of testifying experts called by adverse parties"). As the present memorandum does not appear to fall under the work product rule, *see supra*, we need not address these issues.

**486**

(noting three principal approaches to this problem: (1) strict responsibility for the disclosure; (2) no disclosure as there is no intentional relinquishment of the privilege; and (3) consideration of a multitude of factors to determine voluntariness of the disclosure); *see, e.g., Alldread v. City of Grenada*, 988 F.2d 1425, 1434 (5th Cir.1993) (following a "majority of courts" in looking to "the facts surrounding a particular disclosure"); *Manufacturers and Traders Trust Co. v. Servotronics, Inc.*, 132 A.D.2d 392, 399, 522 N.Y.S.2d 999 (N.Y.App.Div.1987) (holding that "[i]ntent must be the primary component of any waiver test"); *Clagett v. Commonwealth*, 252 Va. 79, 472 S.E.2d 263, 270 (1996) (explaining that when a "communication takes place under circumstances such that persons outside the privilege can overhear what is said" waives the attorney-client privilege); *cf. State v. Soto*, 84 Hawai'i 229, 239–41, 933 P.2d 66, 76–78 (1997) (holding that communications between a criminal defendant and her counsel knowingly conducted in a public hallway of the circuit courthouse in the presence of a confidential informant who was not a member of the defense team were not protected by the attorney-client privilege because they were not "confidential").

"Traditionally, courts have held that inadvertent disclosure waives the privilege because the client and attorney possess sufficient means to preserve the secrecy of a communication and because disclosure makes achievement of the benefits of the privilege impossible." *Manufacturers and Traders*, 132 A.D.2d at 398, 522 N.Y.S.2d 999; *see also Apex Municipal Fund v. N–Group Securities*, 841 F.Supp. 1423, 1432 (S.D.Tex.1993) ("Under the traditional approach an inadvertent disclosure automatically waived the privilege."); 8 Wigmore, *Evidence* § 2325 at 633 (McNaughton rev. 1961) ("All involuntary disclosures, in particular, through the loss or theft of documents from the attorney's possession, are not protected by the privilege, on the principle that, since the law has granted secrecy so far as its own process goes, it leaves to the client and attorney to take the measures of caution sufficient to prevent being overheard by third persons. The risk of insufficient precautions is on the client.").

It would appear the traditional test has been rejected in Hawai'i. HRE Rule 511 provides that a disclosure must be "voluntary[,]" thus indicating that a disclosure that is involuntary would not result in a loss of privilege. Moreover, it has been observed that the traditional approach appears to be unduly harsh inasmuch information could be prevented from being introduced into court "at least prior to the time that remedying an accidental production would cause the adversary any prejudice[.]" *Manufacturers and Traders*, 132 A.D.2d at 398, 522 N.Y.S.2d 999 (citations omitted).

Other courts have stated that only the client can waive the privilege, and thus inadvertent disclosures by an attorney or a representative cannot amount to a voluntary waiver.[41] *KL Group v. Case, Kay & Lynch*, 829 F.2d 909 (9th Cir.1987) is illustrative, insofar as the Ninth Circuit applied HRE Rule 511 in a diversity case involving a Hawai'i party. In *KL Group*, a letter between a law firm and its client was inadvertently produced among 2,000 other documents during the course of discovery. *Id.* at 917. The ninth circuit noted that only the client held the right of the privilege. Thus that court held that "under either Hawai'i or California law, [the client] did not waive its attorney-client privilege by [the law firm's] production of the letter." *Id.* at 919.

 We believe that this approach, however, ignores the fact that an attorney acts as an agent and may possess the authority to bind the client. Instead, the modern approach, which we choose to adopt, is that "consideration is given to all of the circumstances surrounding the disclosure[.]" *Alldread*, 988 F.2d at 1433. Under such an approach, a court may consider the following factors: "(1) the reasonableness of precautions taken to prevent disclosure; (2) the amount of time taken to remedy the error; (3) the scope of discovery; (4) the extent of the disclosure; and (5) the overriding issue of fairness." *Id.* In *Alldread*, the court explained the rationale behind this approach, stating:

> [t]his analysis serves the purpose of the attorney client privilege, the protection of communications which the client fully in-

---

**41.** We note that it is unknown whether Obayashi made the disclosure, or some other party.

tended would remain confidential, yet at the same time will not relieve those claiming the privilege of the consequences of their carelessness if the circumstances surrounding the disclosure do not clearly demonstrate that continued protection is warranted.

*Id.* Accordingly, a trial court must look to the facts of each case to determine whether a waiver has occurred. We will review a ruling on waiver under a clearly erroneous standard. *See id.* (noting that the court's findings "are essentially factual in nature and therefore are reviewed under a clearly erroneous standard").

### XVI.

 Applying the foregoing factors, we believe the court erred in issuing a protective order. From the depositions, it is apparent that little effort was made to keep the memorandum confidential. Obayashi admits that it has no idea how the expert witness obtained the memorandum, nor does it appear from the testimony that steps were made to ensure the security of the document once it was given out. Minimal efforts could have been made, such as noting on the top of the page that the document was confidential.

Also, the time it took for Obayashi to assert privilege was not reasonable. Presumably the EIS was read by either Obayashi or a representative of Obayashi before it was made public, and the revelation of confidential memorandum as a citation should have alerted someone as to the mistake. However, no effort was made to rectify this error until Plaintiffs sought the memorandum. In addition, despite requests for the memorandum in August, 1995, Obayashi did not begin claiming that the memorandum was privileged until October, 1995.

Finally, in the interest of fairness, Plaintiffs should have had an opportunity to review the memorandum. As Plaintiffs argue, Obayashi received the presumed benefit of citing to the memorandum in the EIS. Because Plaintiffs are, in effect, attacking the validity of Obayashi's compliance with state and city laws, it would be unfair to allow Obayashi to cite a source of information to gain approval, but to withhold the same information when such approval was challenged.

However, despite the court's error, we believe that the issuance of a protective order was harmless. In their memorandum in opposition to the protective order, Plaintiffs stated that they sought to demonstrate "that the 'agricultural' plan is essentially a sham designed to camouflage and justify an upscale housing development and does not satisfy the requirements of State or County land use law." Thus, the purpose of the discovery was to attack the proposal itself. But, as noted above, such a review is premature, and accordingly it does not appear that the memorandum would have assisted Plaintiffs in their argument. As such, Plaintiffs were not prejudiced by the court's protective order.

### XVII.

We therefore affirm the January 30, 1998 final judgment.