Dissenting Opinion by
POLLACK, J.
I agree with the majority that the Land Use Commission erred in failing to find, by a preponderance of the evidence, that the reclassification at issue in this case was not violative of part III of Chapter 205 as required by HRS § 205-4(h) (2001). As a result of this error, I would vacate the approval of the petition and remand the case in order for the Commission to discharge its duty to find, by a clear preponderance of the evidence, whether or not the proposed reclassification is violative of Part III. I would also provide further guidance to the Commission with regard to its review of the petition on remand.
I. HRS § 205-4(h)
HRS § 205-4(h) requires the Land Use Commission, before approving a land use district boundary, to “find[ ] upon the clear preponderance of the evidence that the proposed boundary is reasonable, not violative of section 205-2 and part III of this chapter, and consistent with the policies and criteria established pursuant to sections 205-16 and 205-17.” HRS § 205-4(h) (emphasis added).
Part III of Chapter 205 declares “that the people of Hawaii have a substantial interest in the health and sustainability of agriculture as an industry in the State” and that
[tjhere is a compelling state interest in conserving the State’s agricultural land resource base and assuring the long-term availability of agricultural lands for agricultural use to achieve the purposes of:
(1) Conserving and protecting agricultural lands;
(2) Promoting diversified agriculture;
(3) Increasing agricultural self-sufficiency; and
(4) Assuring the availability of agriculturally suitable lands,
pursuant to article XI, section 3, of the Hawaii State Constitution.
HRS § 205-41 (Supp.2005).
The plain language of HRS § 205-4(h) necessitates a finding by the Land Use Commission that a proposed reclassification is not violative of, inter alia, Part III of Chapter 205. It follows that Part Ill’s declaration of policy in HRS § 205-41 must be considered by the Commission in all instances whei'e HRS § 205-4(h) directs it to find, by a clear preponderance of the evidence, that the reclassification is not violative of Part III of Chapter 205. The Commission is directed to make such findings when asked to resolve “petitions for changes in district boundaries of lands within conservation districts, lands designated or sought to be designated as important agricultural lands, and lands greater than fifteen acres in the agricultural, rural, and urban districts, except as provided in section 201H-38.” HRS § 205-4(a) (emphases added). See Kilauea Neighborhood Ass’n v. Land Use Comm’n, 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988) (“Under [HRS] § 205-4(g), the LUC is required to file findings of fact and conclusions of law when acting upon a petition for reclassification.”); of. Ka Pa'akai O Ka'Aina v. Land Use Comm’n, State of Hawai'i 94 Hawai'i *525 31, 44, 7 P.3d 1068, 1081 (2000) (“In order to comply 'with HRS § 205-4(h)’s mandate, the LUC is required to enter specific findings that, inter alia, the proposed reclassification is consistent with the policies and criteria of HRS § 205-17(3)(B).”).
Thus, whenever petitions of the nature contemplated by HRS § 205-4(a) are involved, the Land Use Commission is to consider in its decision-making process the policies encompassed by HRS § 205^11. It has been aptly stated that policies set forth in statutes “provide guidance to the reader as to how the act should be enforced.” Poe v. Haw. Labor Relations Bd., 97 Hawai'i 528, 540, 40 P.3d 930, 942 (2002) (quoting Price Dev. Co. v. Orem City, 995 P.2d 1237, 1246 (Utah 2000)). HRS § 205-41, as a section within Part III of Chapter 205, is expressly cross-referenced by HRS § 205-4(h) as a relevant consideration that the Commission should account for in evaluating petitions for changes in district boundaries listed in HRS § 205-4(a). Hence, the State policies established in HRS § 205-41, although not creating substantive rights for a party, “provide guidance” to the Commission in the course of deciding, pursuant to HRS § 205-4(h), whether to approve amendment petitions enumerated in HRS § 205-4(a), such as the petition involved in this case. Id.; see Nat’l Wildlife Fed’n v. Gorsuch, 693 F.2d 156, 178 (D.C.Cir.1982) (“Congress’ strong statement of its objective must color [the Environmental Protection Agencyl’s ... interpretation of specific provisions of the [Clean Water] Act.”); see generally 1A Sutherland Statutory Construction § 20:12 (7th ed.).
Based on the plain language of HRS § 205-4(h), consideration of Part III of Chapter 205, including the State’s policies under HRS § 205-41, is not contingent on whether the petition lands were already slated for urban development under county plans or on whether the county does not intend to designate them as important agricultural lands. As discussed, what triggers the Land Use Commission’s obligation to find that a proposed reclassification is not violative of Part III of HRS Chapter 205 are petitions governed by HRS § 205-4(a). Once any of such petitions are involved, the Commission is not excused from considering Part III and from incoiporating the State policies under HRS § 205-41 into its decision-making process. See id. “Pursuant to the policies underlying Part III, state and county government should consider the ‘compelling state interest’ in conserving the State’s agricultural land resource base assuring the long term availability of agricultural lands for agricultural use....” Majority at 507, 364 P.3d at 215.
In this case, by neglecting to consider Part III, as required by HRS § 205-4(h), the Land Use Commission failed to incorporate the guidance that HRS § 205-41 provides in its analysis and in its final approval of the proposed reclassification; therefore, the Commission erred. See HRS § 91—14(g)(1) (authorizing the court to remand an administrative case for further proceedings if it finds that that the agency acted “[i]n violation of ... statutory provisions”). Whether this error is harmless cannot be determined with reasonable certainty because this court is not in a position to conclude that the Commission would have acted in the same or similar manner had it fully applied Part III of section 205-specifically the policies embodied by HRS § 205-41-in its decision-making calculus. See Friends of Keeseville, Inc. v. FERC, 859 F.2d 230, 234 (D.C.Cir.1988) (finding that errors are harmless “does not require proof that the errors necessarily changed the result of the proceeding below,” only “that the outcome of an earlier proceeding might have been different had the law been properly applied” (some emphasis added)); cf. Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir.2015) (reasoning that in cases where the appellate court is left to “engage in ... substitution or speculation” as to the conclusions of the administrative law judge, “such error will usually not be harmless”); State v. Pulse, 83 Hawai'i 229, 248, 925 P.2d 797, 816 (error is not harmless when the court is required to speculate as to what the circuit court would have done with respect to a suppression motion had the court heard relevant testimony), amended in 'part by 83 Hawai'i 545, 928 P.2d 39 (1996)). Said differently, an attempt by this court to determine the harmlessness of the Land Use Commission’s error would involve guesswork, de Rodri *526 guez-Echeverria v. Mukasey, 534 F.3d 1047, 1051-62 (9th Cir.2008) (“We decline to speculate as to how the [immigration judge] may have ruled on these questions and remand so that the agency may consider them in the first instance.”); Sierra Club v. EPA, 719 F.2d 436, 466 (D.C.Cir.1983) (holding that remand is necessary when an appellate court is left “to guess as to the agency’s findings or reasons” (quoting Greater Boston Television Corp. v. FCC, 444 F.2d 841, 861 (D.C.Cir.1970)).
In this ease, the Land Use Commission was asked to consider whether over 1,600 acres of prime agricultural land should be reclassified from the state agricultural land use district to the state urban land use district. This land represents a substantial portion of Oahu’s prime agricultural land with access to irrigation water for the production of short-term crops. The land—which an agricultural expert testified to be some of the best suited to vegetable production “in the world”—is located in an ideal geographic location in Central 0‘ahu. The land is among the most productive and valuable lands in the State because of its proximity to market and optimum growing conditions, which includes high solar radiation, high temperatures, low humidity, and ideal soil conditions. As a result, the land produces the highest yields in the State.[1] The proposed development would reclassify this prime agricultural land to an urban district that would allow the building of 11,760 residential units, businesses and commercial areas, transit stops, schools, parks, and roads.
The complexity and scope of the project involved in this case complicate, and render not feasible, a harmless error analysis. This is particularly true given the importance of the land as prime agricultural land that represents a significant portion of the available agricultural lands on 0‘ahu. Had the Land Use Commission adhered to its duty to consider Part III in its decision-making process, a number of possible results could have been reached. The Commission could have decided in the same manner as it did in this case. Another possibility is that the Commission could have imposed any number of different or additional conditions as part of its approval of the reclassification petition. Alternatively, the Commission could have opted to limit the area of land to preserve the agricultural viability of some of the State’s most fertile lands. The Commission could even have denied the proposed reclassification. Simply put, this court cannot with reasonable certainty decide that the Commission would have arrived at the same decision in this case given the myriad alternatives to that decision.
Thus, I would find that the Land Use Commission violated HRS § 205-4(h) and that its approval of the petition for land use boundary reclassification should be vacated and the petition remanded in order for the Commission to discharge its duty to find, by a clear preponderance of the evidence, whether or not the proposed reclassification is violative of Part III within a decision-making framework guided by the State policies declared in HRS § 205^41. See HRS § 91-14(g)(1).
II. Article XI, Section 3
As stated, in my view, this case should be remanded to the Land Use Commission due to its failure to consider Part III as required by HRS § 205-4(h), and on remand, I would also direct the Land Use Commission to consider, in its review of the petition, Article XI, Section 3, which protects agricultural lands.
Article XI, Section 3 became part of the Hawai'i Constitution in 1978. It was adopted in response to concerns with the urbanization of agricultural lands. As explained by a delegate to the 1978 Constitutional Convention, Article XI, Section 3 was the “fundamental change that [was] being called for in the state government” to preserve important agricultural lands “against the pressure to urbanize.” 1 Proceedings of the Constitutional Convention of 1978 at 440 (statement of Del. Harris).[2] Even though the existing *527 land use law stated that the preservation of agricultural lands was a prime objective, id,., many delegates indicated that this objective was not being achieved. See id. at 440 (“[A] substantial part of lands reclassified to a higher use comes from agricultural lands.”); id. at 442-43 (written testimony of Del. Hor-nick) (lamenting that “agricultural productivity has not been a significant factor in Commission decision-making” and concluding that the Land Use Commission’s “role in preserving agricultural lands has been dubious, despite its intended purpose”); id. at 443 (Del. Odanaka) (“Totally unrestrained growth has destroyed the character of many neighborhoods in my district.”). Thus, Article XI, Section 3 was adopted in an effort “to preserve agriculture as an economic base for the Islands and keep agricultural lands to the extent possible as open space.” Id. at 441 (statement of Del. Waihee).[3]
Consistent with the intent of its framers to preserve agricultural lands, Article XI, Section 3 includes a mandate directed at the State of Hawaii:
The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands.
Haw. Const, art. XI, § 3. This initial sentence of Section 3 expressly mandates the State to fulfill four specific requirements related to agricultural lands.[4] Because the court’s decision in Save Sunset Beach Coalition v. City & County of Honolulu, 102 Hawai'i 465, 78 P.3d 1 (2003), did not involve a claim derived from this sentence of Article XI, Section 3, the question remains as to whether this provision imposes an obligation that is independent of any enabling legislation.
A.
A court will decline to enforce a constitutional provision that is not self-executing. See Cty. of Haw. v. Ala Loop Homeowners, 123 Hawai'i 391, 410, 235 P.3d 1103, 1122 (2010) (citing State v. Rodrigues, 63 Haw. 412, 629 P.2d 1111 (1981)). A constitutional provision is self-executing “if it supplies a sufficient rule by means of which the right given may be enjoyed and protected.” Rodrigues, 63 Haw. at 414, 629 P.2d at 1113 (quoting Davis v. Burke, 179 U.S. 399, 403, 21 S.Ct. 210, 45 L.Ed. 249 (1900)). In other words, a constitutional provision is considered self-executing whenever it is enforceable on its own and does not require implementing legislation. See Rodrigues, 63 Haw. at 414, 629 P.2d at 1113 (“[A] constitutional provision which only establishes a general principle is not self-executing and requires more specific legislation to make it operative.”); Figueroa v. State, 61 Haw. 369, 382, 604 P.2d 1198, 1206 (1979) (“The self-executing clause only means that the rights therein established or recognized do not depend upon further legislative action in order to become operative.”).[5]
Determining whether a constitutional provision is self-executing must be done “with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent.” See Ala Loop Homeowners, 123 Hawai'i at 404, 235 P.3d at 1116 (quoting In re Water Use Permit Applications, 94 Hawai'i 97, 131, 9 P.3d 409, 443 (2000)). By its own terms, the Hawaii Constitution directs the courts to *528 enforce the Constitution and discourages the judiciary from relegating enforceable provisions to merely non-self-executing statements of policy. Haw. Const, art XVI, § 16 (“The provisions of this constitution shall be self-executing to the fullest extent that their respective natures permit.”). Given the clear intent that our Constitution’s provisions “shall be self-executing to the fullest extent that their respective natures permit,” a constitutional provision is self-executing unless it was clearly the intent of the framers that it not be enforceable by the judiciary.
B.
A constitutional provision “is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law.” Rodrigues, 63 Haw. at 414, 629 P.2d at 1113 (quoting Davis, 179 at 403, 21 S.Ct. 210). Thus, a provision that is merely a statement of public policy that does not create an obligation or right, would not be considered self-executing. See id. (“[A] constitutional provision which only establishes a general principle is not self-executing and requires more specific legislation to make it operative.”).[6] Additionally, provisions that direct the legislature to enact laws or that create a right contingent on legislative enactment are often not considered self-executing where there is not otherwise a rule that is judicially enforceable. See Save Sunset Beach Coal. v. City & Cty. of Honolulu, 102 Hawai'i 465, 476, 78 P.3d 1, 12 (2003) (holding that future legislation was required for Article XI, Section 3’s provision requiring a two-thirds vote of the body responsible for the reclassification or zoning action to be effective); Rodrigues, 63 Haw. at 414-15, 629 P.2d at 1113-14 (concluding that “as provided by law” in Article I, Section 11 called for implementing legislation because there was no other constitutional provision or statute at the time the amendment was adopted).
Our case law evaluating the doctrine of self-execution demonstrates that the inclusion of language directing the legislature to enact laws does not necessarily mean that the provision is not intended to be self-executing, although such language may, under certain circumstances, demonstrate that implementing legislation is required. See Ala Loop Homeowners, 123 Hawai'i at 404, 235 P.3d at 1116; see also United Pub. Workers v. Yogi, 101 Hawai'i 46, 62 P.3d 189 (2002); In re Water Use Permit Applications, 94 Hawai'i 97, 9 P.3d 409 (2000), In determining whether a statute is self-executing, the language of the provision at issue must be closely reviewed “to determine whether it indicates that the adoption of implementing legislation is necessary” Ala Loop Homeowners, 123 Hawai'i at 412, 235 P.3d at 1124 (emphasis added). A reference to laws or legislation may refer to an existing body of statutory laws or it may also refer to supplemental, rather than implementing, legislation. See id. at 412-13, 235 P.3d at 1124-25.[7] All in all, this analysis is done in the context of the Constitution’s express directive that provisions of the Constitution “shall be self-executing to the fullest extent that them respective natures permit.” Haw. Const, art. XVI, § 16.
C.
Article XI, Section 3 provides:
The State shall conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally *529 suitable lands. The legislature shall provide standards and criteria to accomplish the foregoing.
Lands identified by the State as important agricultural lands needed to fulfill the purposes above shall not be reclassified by the State or rezoned by its political subdivisions without meeting the standards and criteria established by the legislature and approved by a two-thirds vote of the body responsible for the reclassification or rezoning action.
Haw. Const. art. XI, § 3.
“The first sentence of section 3 sets out a mandate with respect to the preservation of agricultural lands,” Save Sunset Beach Coal. v. City & Cty. of Honolulu, 102 Hawai'i 465, 475, 78 P.3d 1, 11 (2003); it provides that the State “shall” (1) “conserve and protect agricultural lands,” (2) “promote diversified agriculture,” (3) “increase agricultural self-sufficiency,” and (4) “assure the availability of agriculturally suitable lands.”
While the first sentence of Section 3 lists four responsibilities that the “State shall” accomplish, the second sentence obligates the legislature to enact related legislation: “The legislature shall provide standards and criteria to accomplish the foregoing.” Thus, in addition to the mandate directed at the State, there is also a mandate directed at the legislature to provide complementary “standards and criteria.”[8] Although the court in Save Sunset Beach noted in a footnote that this “reference to further legislative action dictates that section 3 is not self-executing,” 102 Hawai'i at 476 n. 22, 78 P.3d at 12 n. 22, the holding in Save Sunset Beach was limited to the second paragraph of Article XI, Section 3: “[T]he framers appear to have required that ‘standards and criteria’ be adopted by the legislature before the second paragraph relating to a two-thirds vote becomes operative.” Id. at 476, 78 P.3d at 12; see also Ala Loop Homeowners, 123 Hawai'i at 412, 235 P.3d at 1124 (explaining that Save Sunset Beach “concluded that article XI, section 3 read as a whole required future action to be taken by the legislature in order for the ‘two-thirds vote of the body responsible for the reclassification or rezoning action’ provision to be effective”).
Indeed, the second paragraph integrates future legislative enactment into its requirements in such a manner that makes it unmistakable that the second paragraph is contingent on future legislation. The requirements of the second paragraph are more narrowly focused on the reclassification of important agricultural lands, and it provides that “[l]ands identified by the State as important agricultural lands” “shall not be reclassified by the State or rezoned by its political subdivisions without meeting the standards and criteria established by the legislature and approved by a two-thirds vote of the body responsible for the reclassification.” As a result, the requirements of the second paragraph, which concern reclassification and rezoning, are contingent on the “standards and criteria established by the legislature,” and thus, implementing legislation was required to make the second paragraph of Section 3 effective. See Save Sunset Beach, 102 Hawai'i at 476, 78 P.3d at 12 (explaining that *530 “no ‘standards and criteria’ ” had been enacted at the time of that decision). Interestingly, the second paragraph also makes reference to the State’s duty as it pertains to “[ljands identified by the State as important agricultural lands.” Thus, the second paragraph implies that the State’s identification of important agricultural lands is separate from the standards and criteria established by the legislature for reclassification and rezoning. Additionally, the obligation of the State to identify important agricultural lands is placed upon the State, not the legislature, and may be independent of required legislation to reclassify lands that have been so identified.
Unlike the second paragraph, the mandate directed at the State in the first sentence of Section 3 does not appear to incorporate legislative enactment as necessary for the mandate to be effective. See Ala Loop Homeowners, 123 Hawai'i at 412, 235 P.3d at 1124 (stating that the court reviews the language of the provision closely to determine whether “the adoption of implementing legislation is necessary”). In other words, the State’s mandate is not expressly made dependent on, or limited in scope by, legislative enactment. If this were the intent, the first paragraph of Article XI, Section 3 could simply have been written to state, “The legislature shall provide standards and criteria to conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency, and assure the availability of agriculturally suitable lands.” Thus, the legislature’s obligation to provide standards and criteria is complementary, rather than necessary, to the State’s mandate.
Further, the legislature’s parallel obligation to “provide standards and criteria to accomplish” the State’s obligation, did not absolve the State at the time the Constitution was amended from fulfilling its obligation under the machinery that existed at the time the amendment was adopted. In fact, at the time of the Constitutional Convention of Ha-wai'i of 1978, there was already a statewide system of land use planning and regulation in existence that included the Land Use Commission.[9] Indeed, one delegate at the 1978 convention pointed out the need for more accountability on the part of the Land Use Commission in preserving agricultural lands and discussed the land use laws that existed at that time. 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 441-43 (written statement of Delegate Horniek).
In any event, the first sentence provides a duty that the State “shall” (1) “conserve and protect agricultural lands,” (2) “promote diversified agriculture,” (3) “increase agricultural self-sufficiency,” and (4) “assure the availability of agriculturally suitable lands.” Thus, in very specific terms, this constitutional mandate sets out what the State’s obligations are with regard to agricultural land, and it is phrased as mandatory rather than as an aspirational goal. Thus, Article XI, Section 3 imposes an affirmative duty on the State that is self-executing. Such an understanding of the first paragraph of section 3 is consistent with the Constitution’s directive that its provisions “shall be self-executing to the fullest extent that their respective natures permit.” Haw. Const, art. XVI, § 16.
Consequently, Article XI, Section 3 expressly places an affirmative duty on State agencies very much like the constitutional provision considered in Ka Pa'akai 0 Ka'Aina v. Land Use Comm’n, 94 Hawai'i 31, 7 P.3d 1068 (2000).[10] This affirmative duty is not merely co-extensive with the requirements and procedures set forth by the *531 legislature, but rather it plays an important role in the protection and preservation of agricultural lands that may be complemented by legislative enactment. The fact that the legislature has been directed to enact related legislation does not limit the scope of the State’s constitutional duty in any way.
D.
To the extent that Article XI, Section 3 requires implementing legislation to be enforceable, the legislature has provided the necessary legislation in Part III of Chapter 205. HRS §§ 205-41 to 205-52 (Supp.2005). Part III of Chapter 205 entitled “Important Agricultural Lands” provides the procedures and criteria to guide the State’s identification of “important agricultural lands” as discussed in the second paragraph of Article XI, Section 3. In enacting Part III, the legislature indicated that it was intended to implement Article XI, Section 3.2005 Haw. Sess. Laws Act 183, § 1, at 580 (“[T]here is a compelling need to provide standards, criteria, and mechanisms to fulfill the intent and purpose of article XI, section 3 of the state constitution and enable implementation of the constitutional mandate.” (emphasis added)).
Part III provides two different procedures for the identification of important agricultural lands that are privately owned. A farmer or landowner may file a petition with the Land Use Commission requesting that lands be designated as important agricultural lands. HRS § 205-45. Alternatively, each county is required to “identify and map potential important agricultural lands within its jurisdiction.” HRS § 205-47. Whether the process is initiated by a private party or the county, the Land Use Commission is ultimately responsible for making the designation. HRS §§ 205-45, 205-49.
The Land Use Commission’s ultimate responsibility for designating “important agricultural lands” under the statutory framework of Part III is consistent with the State’s obligation to designate “important agricultural lands” under the second paragraph of Article XI, Section 3. This is also in agreement with the State’s obligations under the first sentence of Section 3, which more broadly applies to “agricultural lands” rather than to just “important agricultural lands.”
Under the statutory framework for identifying “important agricultural lands,” the counties are responsible for first identifying and mapping potential important agricultural lands and, then, making “recommendations” to the Land Use Commission for designation. HRS §§ 205-47, 205-48. State agencies are required to review the submissions of the counties to ensure that there is an “identified resource base” and that the county has met the “minimum standards and criteria” set out in Part III. HRS § 205-48. It is not clear what, if anything, the Land Use Commission or other state agency is empowered to do if it is determined that a county’s recommendation does not “result in an identified resource base.” See HRS § 205-48(c) (explaining state agency review of the county submissions). Once the initial evaluation of the counties’ submissions is complete, the Land Use Commission must then “proceed to identify and designate important agricultural lands.” HRS § 205-49(a), (d). The Land Use Commission is responsible for ensuring that the counties’ recommendations comply with Part III and for making the ultimate decision of which lands are designated as “important agricultural lands.”
In enacting this statutory framework, the legislature found that “land is the basic resource for agriculture and the supply of lands suitable for agriculture is an irreplaceable resource.” 2005 Haw. Sess. Laws Act 183, § 1, at 580. As additionally specified by the legislature with regard to Act 183, “[T]he purpose of this Act was to further implement article XI, section 3 of the state constitution.” 2005 Haw. Sess. Laws Act 183, § 1, at 581. Accordingly, the legislature has provided the implementing legislation for Article XI, Section 3 to the extent that it is not self-executing.
E.
As discussed above, Article XI, Section 3 charges the Land Use Commission with significant duties regarding agricultural lands. In fact, although agencies’ powers are typically delineated by statute, “an agency’s statutory duties must be performed in a manner that is consistent with the Hawai'i Constitution.” Mauna Kea Anaina Hou v. Bd. of *532 Land & Nat. Res., SCAP-14-0000873, 2015 WL 7760324, at *42 (Dec. 2, 2015) (slip op.) (Pollack, J., concurring). Thus, the Land Use Commission “must execute its statutory duties in a manner that fulfills the State’s affirmative constitutional obligations.” Id. at *43.
Agencies are often asked to decide issues that are of profound importance to the general public and that implicate constitutional rights and duties. See id. at *44 (citing In re ‘Iao Ground Water Mgmt. Area High-Level Source Water Use Permit Applications, 128 Hawai'i 228, 231, 287 P.3d 129, 132 (2012); Ka Pa'akai O Ka'Aina v. Land Use Comm’n, 94 Hawai'i 31, 34, 7 P.3d 1068, 1071 (2000)). In this case, the Land Use Commission was asked to consider whether over 1,500 acres of prime agricultural land should be reclassified from the state agricultural land use district to the state urban land use district. Thus, this ease demonstrates the Commission’s role in deciding questions of immense importance to the public that implicate the protections secured by our Constitution. When such issues are before an agency, the agency must, to the extent possible, “execute its statutory duties in a manner that fulfills the State’s affirmative obligations under the Hawaii Constitution.” Mauna Kea Anaina Hou, SCAP-14-0000873, at *47. The Land Use Commission, as an agency of the State, is obligated in its decision making to (1) “conserve and protect agricultural lands,” (2) “promote diversified agriculture,” (3) “increase agricultural self-sufficiency,” and (4) “assure the availability of agriculturally suitable lands.” Cf. Pub. Access Shoreline Haw. v. Haw. Cty. Planning Comm’n, 79 Hawai'i 425, 450, 903 P.2d 1246, 1271 (1995). The Commission may not act without independently considering the effect of its actions on the protections afforded agricultural farmlands under Article XI, Section III. See id. at 437, 903 P.2d at 1258. “Hence, an agency may not fulfill its statutory duties without reference to and application of the rights and values embodied in the constitution.” Mauna Kea Anaina Hou, SCAP-14-0000873, at 43.
III. CONCLUSION
Because the Land Use Commission failed to make findings and conclusions as to whether the reclassification, by clear preponderance of the evidence, is not violative of Part III of Chapter 205 as required by HRS § 205^4(h), I would vacate and remand the petition for further proceedings consistent with its duties under HRS § 205-4(h), Part III of Chapter 205. And, I would also direct the Commission on remand to apply Article XI, Section 3 of the Hawaii Constitution in a manner consistent with its responsibilities.

. Crops grown on the land include bananas, basil, snap peas, broccoli, cabbage, seed corn, sweet corn, cucumbers, eggplant, lettuces, melons, dry onions, bell peppers, squash, pumpkin, and tomatoes. These crops are grown both for local markets as well as exports.

. Delegate Harris later served as the Mayor of the City and County of Honolulu from 1994 to *527 2004. Eugene Tanner, Jeremy Harris—The Exit Interview, Honolulu Advertiser (Oct. 31, 2004), http://the.honoluluadvertiser.com/article/2004/ Oct/3 l/op/op03p.html.

.Delegate John Waihee, III, later was elected as the Lieutenant Governor of Hawaii in 1982, and he served as Governor from 1986 to 1994. Hawaii Governor John Waihee, Nat’l Governors Ass'n, http://www.nga.org/cms/home/govemors/ past-govemors-bios/page_hawaii/col2-content/ main-content-list/title_waihee_john.default.html (last visited Dec. 11, 2015).

. See Save Sunset Beach Coal. v. City & Cty. of Honolulu, 102 Hawai'i 465, 475, 78 P.3d 1, 11 (2003) ("The first sentence of section 3 sets out a mandate with respect to the preservation of agricultural lands.”).

. See also, e.g., John L. Horwich, Montana’s Constitutional Environmental Quality Provisions: Self-Execution or Self-Delusion?, 57 Mont. L. Rev. 323, 335 & n. 63 (1996) (explaining that the doctrine of self-execution applies where a legislative enactment is necessary for enforcement of a constitutional provision).

. See Jose L. Fernandez, State Constitutions, Environmental Rights Provisions, and the Doctrine of Self-Execution: A Political Question?, 17 Harv. Envtl. L. Rev. 333, 342 (1993) (identifying three types of constitutional provisions: non-mandatory, mandatory, and mandatory-prohibitory; and explaining that non-mandatory provisions "do not order a particular result, impose a duty, or create an obligation” but "merely state an expression of public sentiment or a public policy for the legislature to effectuate at its discretion”); cf. Horwich, supra, at 358 (explaining that "[s]ome constitutional provisions express goals or public objectives designed to inform all those who may read the constitution of the values held by the citizens who adopted it” and that, although these provisions provide guidance to lawmakers, they "do not create standards which may be judicially enforced”).

. See generally Fernandez, supra at 345, 351-53 (describing provisions that include both "a clear prohibition and an open call for legislative enabling action”).

. Although not self-executing, a mandate to enact legislation is not "a dead letter” in the absence of implementing legislation. Cf. In re Sweeley, 12 Misc. 174, 33 N.Y.S. 369, 372 (N.Y.Sup.Ct.), aff'd sub nom. People ex rel. Sweeley v. Wilson, 146 N.Y. 401, 42 N.E. 543 (1895) (finding that a constitutional amendment that was not self-executing could still have an effect on pre-existing legislation before the implementing legislation was adopted); Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 389 A.2d 465, 476 (1978) (finding the court had "the power to enforce rights recognized by the New Jersey Constitution, even in the absence of implementing legislation”). See generally Horwich, supra, at 351-53 (discussing legislative mandates and explaining that "[t]hese constitutional mandates still may perform important functions, which are often overlooked in traditional self-execution analysis” such as establishing parameters for enacted legislation and guiding "the interpretation of other state action”). Of course, this court "is to interpret constitutional questions as long as there do not exist uncertainties surrounding the subject matter that have been clearly committed to another branch of government to resolve.” Nelson v. Hawaiian Homes Comm'n, 127 Hawai'i 185, 197, 277 P.3d 279, 291 (2012) (holding that constitutional history provided "judicially discoverable and manageable standards, as well as initial policy determinations” to support the court's determination of what would constitute "sufficient sums” for "development of home, agriculture, farm and ranch lots” as provided for in Article 12, Section 1).

. See generally 1 Proceedings of the Constitutional Convention of Hawaii of 1978, at 235 (statement of Delegate Kaito); id. at 441-43 (written statement of Delegate Homick).

. In Ka Pa'akai, the court concluded that the Land Use Commission’s findings and conclusions of law were insufficient for appellate review of whether the Commission fulfilled its constitutional obligation under Article XII, Section 7. 94 Hawai'i at 47-50, 7 P.3d at 1084-87. Article 12, Section 7 provides, "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.” Haw. Const. art. XII, § 7. Article XII, Section 7, like Article XI, Section 3, provides an affirmative mandate to the State to preserve and protect customary and traditional rights.