NEIGHBORHOOD BOARD NO. 24 (WAIANAE COAST); WAIANAE HAWAIIAN CIVIC CLUB; NANAKULI HAWAIIAN HOMESTEAD ASSOCIATION; MIKILUA FARM BUREAU; WAIANAE LAND USE CONCERNS COMMITTEE, Appellants, *v.* STATE LAND USE COMMISSION, STATE OF HAWAII; OAHU CORPORATION and CITY AND COUNTY OF HONOLULU PLANNING COMMISSION, Appellees

NO. 7112

CIVIL NO. 53333

JANUARY 22, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ., AND RETIRED JUSTICES OGATA AND MENOR ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY LUM, J.

Appellants, five organizations composed of residents of Waianae, Nanakuli and Maili, Oahu, challenge the granting of a special permit pursuant to HRS § 205-6 (1976) to appellee Oahu Corporation ("Oahu") for construction of a major amusement park on 103 acres of land situated in an agricultural district[1] at Kahe Point on the Waianae Coast. We conclude that a special permit should not have been granted to Oahu, and accordingly reverse the circuit court's decision upholding its issuance.

On March 3, 1977, Oahu submitted its application for a special permit to appellee, the Planning.Commission of the City and County of Honolulu, seeking permission to develop a recreational theme park on the agricultural lands. As proposed, the park was to consist of cultural theme rides, restaurants, fast food shops, retail stores, exhibits, theaters, an amphitheater, a bank, nurseries, twelve acres of parking, a sewage treatment plant, and other related support services.

The proposed situs has been vacant and undeveloped since 1960. Its soils had been assigned a Land Study Bureau overall productivity rating of "E", or very poor for overall agricultural productivity with frequent rock out-croppings.[2] Immediately south,

---

[1] Designation of the lands in question for agricultural purposes was done by the State Land Use Commission in accordance with HRS § 205-2, which requires the commission to divide all of the state's lands into four major land use districts: urban, rural, agricultural and conservation. The City and County of Honolulu located the parcel in an AG-1 Restricted Agricultural District.

[2] The overall productivity rating, utilized in the statutory land use scheme for determining permissible uses in agricultural districts, see HRS § 205-4.5 (1976 & Supp. 1981), evaluates the soil's general productive capacity in agricultural use, the rating of "A" denoting the highest level of productivity and "E" the lowest. *Detailed Land Classification – Island of Oahu,* Land Study Bureau Bulletin No. 11 at 19-20 (1972).

between the subject parcel and Kamehameha Highway, are thirteen single-family homes which form part of an old agricultural subdivision. The lands further south of the site, although under sugar cultivation at the time of Oahu's application, were reclassified from an agricultural to an urban district in June 1977 to permit construction of a residential, commercial and resort development. Northwest of the site stands the Hawaiian Electric Kahe Power Plant, beyond and to the side of which lie lands designated for agricultural use.

The planning commission held its hearing on Oahu's application on June 21, 1977, at which time both oral and written testimony were received from various individuals and organizations concerning the proposed development.[3] The commission subsequently approved Oahu's application by a single vote margin, despite the fact that the City and County Department of Land Utilization and the Office of Environmental Quality Control had both recommended against the application's approval. The matter was then referred to appellee, the state Land Use Commission ("LUC"), for its review pursuant to HRS § 205-6.[4]

Appellants thereafter filed a petition with the LUC for intervention and a contested case hearing, seeking an opportunity for formal participation in the LUC hearing on Oahu's application. The LUC denied appellants' petition and approved Oahu's application.

---

[3] It is undisputed that this hearing was not held in accordance with the contested case provisions of HRS ch. 91, Hawaii's Administrative Procedure Act, although it was conducted in compliance with the time limits and notice requirements of HRS § 205-6 (1976).

[4] Under HRS § 205-6 (1976), a decision by the county planning agency in favor of a special permit applicant is subject to LUC approval. Upon receipt of the planning commission's findings and decision, the LUC has 45 days within which to approve, approve with modification, or deny the petition. Denials by either the planning commission or the LUC are appealable to the circuit court of the circuit in which the land is located.

The 1979 legislature, however, amended the statute to provide for LUC review of special permit applications only in cases where the land in question exceeds 15 acres in area. Observing that approximately 75% of the special permit applications proposed uses of local impact, the legislature intended by this amendment to streamline the land use regulatory process by requiring the state commission's approval of such permits only where the use desired would be of such scale as to impact the state as a whole. H. Stand. Comm. Rep. No. 572, 10th Haw. Leg., 2d Sess., *reprinted in* 1979 House Journal 1410.

Appellants challenged the LUC decision in circuit court which, on June 22, 1978, sustained the commission's conclusion.

This appeal followed. Appellants contest the issuance of the special permit on numerous grounds, including (1) that HRS ch. 205 requires Oahu to pursue a district boundary amendment rather than a special permit; (2) that Oahu's application failed to meet the substantive special permit requirements of HRS § 205-6 and the Land Use District Regulations; and (3) that appellants were denied their due process and statutory right to a contested case proceeding at the planning commission or LUC level. We find it unnecessary to address all of appellants' contentions, however, as we agree that Oahu's application did not meet the substantive requirements for special permits set forth in HRS § 205-6 and the Land Use District Regulations promulgated by the LUC.[5]

In reviewing the decisions of the planning commission and the LUC approving Oahu's application, we are guided by the common law rule limiting the scope of judicial review of special permit approvals to a determination of whether the administrative bodies committed errors of law or abused their discretion in granting the permit. *See Corwine v. Crow Wing County*, 309 Minn. 345, 244 N.W.2d 482, 486 (1976); *Hansen v. Ponticello*, 37 A.D.2d 892, 325 N.Y.S.2d 795, 797 (1971); 3 A. Rathkopf, *The Law of Zoning and Planning*, § 42.07 at 42-49 to 42-75 (4th ed. 1981 & Supp. 1981); *accord, Appeal of Kates*, 38 Pa. Commw. Ct. 145, 393 A.2d 499, 501 (1978).[6]

---

[5] Before oral argument of this appeal was heard, the LUC filed a motion to dismiss the appeal because of mootness, citing Wong v. Board of Regents, 62 Haw. 391, 616 P.2d 201 (1980). Attached to the motion were letters from the appropriate governmental authorities that seemed to indicate that the special permit was no longer valid due to Oahu's failure to comply with certain conditions attached thereto. Oahu's attorney represented to the court during oral argument that Oahu was not ready to concede the permit's invalidity in the absence of formal notification of the same. Because the present state of the record prevents us from making a definitive determination as to the permit's validity, and because it appears that Oahu would file another special permit application should the present permit be pronounced invalid, we refuse to declare this appeal moot. *See* Johnston v. Ing, 50 Haw. 379, 441 P.2d 138 (1968).

[6] This standard of review essentially mirrors that contained in HRS § 91-14(g)(5) and (6) (1976 & Supp. 1981) of the Hawaii Administrative Procedure Act, which provide that the reviewing court may reverse or modify an agency's decision "if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are: (5) Clearly erroneous in view of

HRS § 205-1 (1976) and § 205-2 (1976), respectively, established the state Land Use Commission and conferred upon it the power to classify all of Hawaii's lands into urban, rural, agricultural or conservation districts based upon existing use, statutory guidelines, LUC standards, and the county general plans. *See generally* D. Mandelker, *Environmental and Land Controls Legislation* ch. VII (1976). Uses permitted for the Kahe Point agricultural lands are enumerated in HRS § 205-2[7] which provides, in pertinent part, that

[a]gricultural districts shall include activities or uses as characterized by the cultivation of crops, orchards, forage, and forestry; farming activities or uses related to animal husbandry, and game and fish propagation; services and uses accessory to the above activities including but not limited to living quarters or dwellings, mills, storage facilities, processing facilities, and roadside stands for the sale of products grown on the premises; agricultural parts and open area recreational facilities.

Recognizing that a major recreational theme park together with its accompanying support facilities would not constitute a permissible use under HRS § 205-2, Oahu sought and obtained a special permit rather than a district boundary amendment, both of which are provided for in HRS ch. 205 to afford landowners relief from the statutory requirements for agricultural districts.

HRS § 205-6 allows the county planning commission and the LUC to issue special permits for "certain unusual and reasonable uses within agricultural and rural districts other than those for

the reliable, probative, and substantial evidence on the whole record; or (6) . . . characterized by abuse of discretion." As the outcome of this appeal would render any present determination as to the applicability of HAPA to special permit proceedings premature, however, we decline to either adopt or reject the HAPA standard of review as that appropriate to this appeal.

[7] HRS § 205-2, § 205-4.5 (1976), and Land Use District Regulation § 3-3 describe the agricultural district and enumerate the permissible uses therein. Agricultural lands containing soil classified by the Land Study Bureau's Detailed Land Classification as Overall Productivity Rating Class A or B are restricted to the uses described in HRS § 205-4.5, while permissible uses on those lands having soil with a productivity rating of C, D, E or U are set forth in HRS § 205-2. *See* HRS § 205-4.5(c), § 205-5 (1976). The subject land at Kahe Point, with an overall productivity rating of E, is thus governed by HRS § 205-2.

which the district is classified," "but only when the use would promote the effectiveness and objectives of [HRS ch. 205]." Whether a particular use is "unusual and reasonable" is determined by applying the five guidelines set forth in the Land Use District Regulation § 5-2 to the proposed project. § 5-2 requires the following:

(1) Such use shall not be contrary to the objectives sought to be accomplished by the Land Use Law and Regulations.

(2) That the desired use would not adversely affect surrounding property.

(3) Such use would not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage and school improvements, and police and fire protection.

(4) Unusual conditions, trends and needs have arisen since the district boundaries and regulations were established.

(5) That the land upon which the proposed use is sought is unsuited for the uses permitted within the District.

The planning commission, adopting the conclusions of the City and County Department of Planning and Economic Development, specifically found that all of the criteria were met by the Kahe Point proposal, despite numerous counter-statements by the DLU and OEQC disputing the factual bases for these conclusions. We deem it unnecessary to review the evidence with respect to all five standards, however, as we are left with a definite and firm conviction that the recreational theme park proposal fails to comply with the first and critical requirement that the proposed use not run contrary to the objectives sought to be accomplished by the Land Use Laws and Regulations, the counterpart of the statutory mandate that the proposed use promote the effectiveness and objectives of HRS ch. 205.

The special use or exception evolved as a land use control device from a recognition of the hardship frequently visited upon landowners due to the inherent rigidity of the Euclidean zoning system, and of the inapplicability of variance or boundary amendment procedures to all land use problems. 3 A. Rathkopf, *supra* § 41.03 at 41-8 to 41-10; 3 R. Anderson, *American Law of Zoning* § 19.01 at 358-59 (2d ed. 1977). Unlike a district boundary amendment, which is analogous to a rezoning in its effect of reclassifying land, and unlike a variance, which permits a landowner to use his property in a manner forbidden by ordinance or statute, a special permit allows the owner to put his land to a use expressly permitted by ordinance

or statute on proof that certain facts and conditions exist, without altering the underlying zoning classification. Its essential purpose, as explained by the state Attorney General, is to provide landowners relief in exceptional situations where the use desired would not change the essential character of the district nor be inconsistent therewith. 1963 Op. Att'y Gen. 63-37. "By the use of the special use permits, the broad division of uses in terms of residential, commercial, and industrial, and subdivisions of each, can be supplemented by requiring a use which falls conveniently within a class assigned to a particular district, but which has singular characteristics which may be incompatible with some uses of such class, to submit the *(sic)* administrative scrutiny, to meet certain standards, and to comply with conditions." 3 R. Anderson, *supra* § 19.01 at 359.

The essential distinction between the special permit and district boundary amendment as vehicles of land use change is reflected in the statutory provisions and Land Use District Regulations governing the administrative process for each. HRS § 205-4 carefully details the procedural and substantive requirements for boundary amendment proceedings, requiring, *inter alia,* (a) opportunity for a public hearing and notice thereof to enumerated parties in conformity with HRS § 91-9; (b) intervention of right upon timely application by specified parties; (c) freely-granted intervention to all other interested parties; and (d) adoption of rules by the LUC pursuant to HRS ch. 91 governing such intervention. The LUC is required to act on a boundary amendment application not more than 180 and not less than 45 days following its public hearing, and pursuant thereto is required to file findings of fact and conclusions of law. Six of nine commissioners must vote affirmatively in order to approve the petition, HRS § 205-1, and no approval may issue unless the LUC finds "upon the clear preponderance of the evidence that the proposed boundary is reasonable, not violative of section 205-2 and consistent with the interim policies and criteria established pursuant to section 205-16.1, or any state plan enacted by the legislature which plan shall supersede any interim guidance policies." HRS § 205-4(h) (1976). Judicial review of any LUC action on a boundary amendment petition is governed by HRS § 91-14. HRS § 205-4(i) (1976). *See generally Town v. Land Use Commission,* 55 Haw. 538, 524 P.2d 84 (1974) (characterizing district boundary amend-

ment proceedings as quasi-judicial and a "contested case" for the purposes of HAPA).

By contrast, HRS § 205-6 provides in general terms for an expedited review of special permit applications. The initial decision to grant or deny such an application is rendered at the county level by the planning commission, which is simply required to conduct a hearing on the petition and to notify interested parties and agencies with respect thereto. Approval requires a simple majority of the commissioners and favorable LUC action within 45 days of the state commission's receipt of the county agency's decision.[8]

The procedural and substantive differences between the two techniques underscore the necessity for their proper application to the particular land use problems they were designed to address. As courts have repeatedly recognized, unlimited use of the special permit to effectuate essentially what amounts to a boundary change would undermine the protection from piecemeal changes to the zoning scheme guaranteed landowners by the more extensive procedural protections of boundary amendment statutes. *See e.g., Kotrich v. County of Du Page,* 19 Ill.2d 181, 166 N.E.2d 601 (1960); *Harte v. Zoning Board of Review,* 91 A.2d 33 (R.I. 1952); *Board of Adjustment v. Stovall,* 218 S.W.2d 286 (Tex. Civ. App. 1949); *cf. Topanga Ass'n v. County of Los Angeles,* 113 Cal. Rptr. 836, 522 P.2d 12 (1974) (variance); *Bryant v. Lake County Trust Co.,* 284 N.E.2d 537 (Ind. 1972) (variance).

We believe that allowance of a special permit for the development of a recreational theme park covering 103 acres of agricultural land, a major commercial undertaking which developers estimate will attract approximately 1.5 million people annually to the Waianae Coast, accordingly frustrates the objectives and effectiveness of Hawaii's land use scheme. By enacting HRS ch. 205 in 1961, the legislature intended, *inter alia,* to "[s]tage the allocation of land for development in an orderly plan," H. Stand. Comm. Rep. No. 395, 1st Haw. Leg., 2d Sess., *reprinted in* 1961 House Journal 855-56, and to redress the problem of "[i]nadequate controls [which] have caused many of Hawaii's limited and valuable lands to be used for purposes that may have a short-term gain to a few but result in a

---

[8] *See supra* n.4.

long-term loss to the income and growth potential of our economy."
Act 187, 1961 Haw. Sess. Laws 299. The interim statewide land use
guidance policies enumerated in HRS § 205-16.1 (1976 & Supp.
1981) and the Hawaii state plan, HRS ch. 226, themselves articulate
as planning objectives the avoidance of scattered urban develop-
ment and the accommodation of urban growth in existing urban
areas. *See* HRS §§ 205-16.1(3), (4), 226-104, -105. We do not believe
that the legislature envisioned the special use technique to be used as
a method of circumventing district boundary amendment proce-
dures to allow the ad hoc infusion of major urban uses into agricul-
tural districts. *See Harte v. Zoning Board of Review, supra; Board of
Adjustment v. Stovall, supra;* D. Mandelker, *supra* at 281.

We therefore conclude that Oahu's Kahe Point proposal is not an
"unusual and reasonable use" which would qualify for a special
permit under HRS § 205-6, and that the planning commission and
LUC abused their discretion in approving Oahu's application. The
proposed recreational theme park is more properly the subject of a
district boundary amendment petition, which would be considered
in accordance with the requirements of procedure and proof set
forth in HRS § 205-4.

Reversed.

*Ronald Albu (William M. Tam* with him on the briefs), Legal Aid
Society of Hawaii, for appellants.

*Benjamin M. Matsubara (Ukishima & Matsubara* of counsel) for
appellee, Land Use Commission, State of Hawaii.

*Steven Lim, (Roger S. Moseley* on the brief), Deputies Corporation
Counsel, for appellee City and County of Honolulu Planning Com-
mission.

*Leslie Fukumoto* (joined in answering briefs: *Matthew S. K. Pyun,
Jr., Pyun, Kim & Okimoto* of counsel) for appellee Oahu Corporation.