**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000173
23-MAY-2022
08:40 AM
Dkt. 61 MO**

NOS. CAAP-17-0000173 and CAAP-17-0000181

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

**CAAP-17-0000173**
HOʻOMOANA FOUNDATION, Appellant-Appellee, v.
LAND USE COMMISSION, STATE OF HAWAIʻI, Appellee-Appellee, and
PUʻUNOA HOMEOWNERS ASSOCIATION, INC.; AND ROSS R. SCOTT,
Appellees-Appellants.

AND

**CAAP-17-0000181**
HOʻOMOANA FOUNDATION, Appellant-Appellee, v.
LAND USE COMMISSION, STATE OF HAWAIʻI, Appellee-Appellant, and
PUʻUNOA HOMEOWNERS ASSOCIATION, INC.; AND ROSS R. SCOTT,
Appellees-Appellees.

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CIVIL NO. 16-1-0160(1))

MEMORANDUM OPINION
(By: Hiraoka, Presiding Judge, Nakasone and McCullen, JJ.)

Appellees-Appellants Puʻunoa Homeowners Association,

Inc. and Ross R. Scott[1] [collectively **Homeowners**], and State of

Hawaiʻi Land Use Commission (**LUC**), appeal from the Circuit Court

of the Second Circuit's (**circuit court**)[2] January 4, 2017

"Findings of Fact, Conclusions of Law, and Order Vacating [LUC's]

_____

[1] Scott was substituted for Devonne Lane, who was a co-petitioner in the administrative proceeding and an appellee in the circuit court.

[2] The Honorable Rhonda I.L. Loo presided.

Decisions and Orders Entered on March 3, 2016" (**Order**) and February 16, 2017 Final Judgment (**Judgment**).  On appeal, Homeowners and LUC challenge the circuit court's decision vacating LUC's March 3, 2016 Declaratory Order, which ruled as a matter of law that "an overnight campground . . . is prohibited by [Hawaii Revised Statutes (**HRS**)] § 205-4.5(a)(6) and cannot be permitted by a special use permit."

## I. Background

Land in Hawaiʻi is divided into four use districts - urban, rural, agricultural, and conservation.  HRS § 205-2(a) (2001).  Agricultural lands are classified from "A" to "E," based on the "soil's general productive capacity," with "'A' denoting the highest level of productivity and 'E' the lowest." Neighborhood Bd. No. 24 (Waianae Coast) v. State Land Use Comm'n, 64 Haw. 265, 266 n.2, 639 P.2d 1097, 1099 n.2 (1982).  Because lands classified as "A" or "B," *i.e.*, Prime Lands, are the most suitable for growing crops, they are restricted to certain uses. However, a landowner may apply for a **Special Permit** to allow "certain unusual and reasonable uses" or may seek a **Boundary Amendment** to have the land re-classified.

The Hoʻomoana Foundation (**Foundation**) has a long-term lease of agricultural class B land, and sought to develop an overnight campground for use by homeless and commercial campers. Homeowners own property adjacent to Foundation's class B Land.

In December 2015, Homeowners petitioned LUC for a Declaratory Order (**Petition**) pursuant to HRS § 91-8 (2012) and Hawaiʻi Administrative Rules (**HAR**) § 15-15-98, to determine whether approval of an overnight camp on class A and B land was

2

obtainable through the Special Permit process or whether a Boundary Amendment was needed.

In February 2016, Foundation filed a "Petition to Intervene and Position Statement" (**Intervention Request**), arguing that it could obtain approval to develop its proposed campground through the Special Permit process and need not apply for a Boundary Amendment. The State of Hawaiʻi Office of Planning and the Maui Department of Planning also filed position statements agreeing that the proposed campground could be approved through the Special Permit process, and the Maui Department of Planning indicated it was processing Foundation's Special Permit request.

LUC held a public meeting on the Petition, receiving public testimony and argument from Homeowners, the Maui Department of Planning, the Office of Planning, and Foundation. LUC allowed only Homeowners to cross-examine witnesses or rebut arguments.

On March 3, 2016, LUC entered a Declaratory Order granting the Petition (**Order Granting Petition**), finding that "the clear prohibition of overnight camps on class A and B rated lands is irreconcilable with the provisions of HRS §205-6 [(2017)] that permit certain 'unusual and reasonable uses' within agricultural districts other than for which the district is classified." To adopt otherwise "would mean that the counties could define away completely any statutory restrictions on agricultural uses" and "results in treating a clear and explicit statutory prohibition as a nullity[.]" LUC concluded that the "only way that overnight camps such as those proposed in the Project can be allowed on the Property is to change its land use

3

classification to one where overnight camps would be permitted." LUC also denied Foundation's Intervention Request as moot.

Foundation appealed, and the circuit court vacated LUC's Order Granting Petition. The circuit court held that the proposed campground could be approved by Special Permit and did not require a Boundary Amendment. In doing so, the circuit court explained that HRS § 205-4.5(a)(6) (Supp. 2015) "did not 'expressly prohibit' overnight camps within the agricultural district" and LUC's conclusion to the contrary was incorrect. The circuit court also explained that "uses not expressly permitted in subsection (a) of HRS §205-4.5 are prohibited unless permitted as provided in HRS §205-6 (2017), which is the special use permit statute, and HRS §205-8 which is the non-conforming use statute."[3] The circuit court noted that it was persuaded by the Hawaiʻi Supreme Court's reasoning in Mahaʻulepu v. Land Use Comm'n, 71 Haw. 332, 790 P.2d 906 (1990), and vacated LUC's Order Granting Petition. The circuit court also reversed the Order Denying Intervention, and remanded the matter to LUC for further proceedings. This appeal followed.

## II.  Standards of Review

"In a secondary appeal, this court applies the standards of HRS § 91-14(g) [(2012)] to determine whether the circuit court decision was right or wrong." Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawaiʻi 376, 388, 363 P.3d 224, 236 (2015). However, a challenge that "LUC exceeded the scope of

---

[3]  HRS § 205-8 is not applicable in this case.

4

their authority under HRS Chapter 205, [] raises an issue of statutory interpretation." Mahaʻulepu, 71 Haw. at 335-36, 730 P.2d at 908.

Generally, questions of statutory interpretation are reviewed de novo, "but in the case of ambiguous statutory language, the applicable standard of review regarding an agency's interpretation of its own governing statute requires this court to defer to the agency's expertise and to follow the agency's construction of the statute unless that construction is palpably erroneous." Gillan v. Gov't Emps. Ins. Co., 119 Hawaiʻi 109, 114, 194 P.3d 1071, 1076 (2008) (cleaned up and emphasis added).

### III. Discussion

The gist of LUC's and Homeowners' appeal is that the circuit court erred in determining that Foundation's overnight camping project may be addressed through a Special Permit rather than a Boundary Amendment. In addition, Homeowners separately argue that the circuit court erred by relying on Mahaʻulepu, and LUC argues that the circuit court erred by determining that Foundation did not waive its Mahaʻulepu argument. Finally, LUC argues that the circuit court erred by reversing the denial of Foundation's motion to intervene.

### A. Legal Landscape

#### 1. Hawaiʻi Constitution

Our constitution requires that the State "conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands" and that the legislature "provide standards and criteria to accomplish" these

mandates.  Article XI, section 3 of the Hawaiʻi State Constitution.  "Lands identified by the State as important agricultural lands needed to fulfill the purposes above shall not be reclassified by the State or rezoned by its political subdivisions without meeting the standards and criteria established by the legislature . . . ."  Id.

### 2.  HRS Chapter 205

#### (a) Purposes

After a close reading of HRS chapter 205, it appears that the legislature enacted a comprehensive scheme to manage land use in Hawaiʻi, and to preserve important agricultural land in particular.  "In the establishment of the boundaries of agricultural districts, the greatest possible protection shall be given to those lands with a high capacity for intensive cultivation[.]"  HRS § 205-2(a)(3).  Declaring that "the people of Hawaii have a substantial interest in the health and sustainability of agriculture as an industry in the State[,]" the legislature also affirmed a compelling interest in preserving agricultural lands:

> There is a compelling state interest in conserving the State's agricultural land resource base and assuring the long-term availability of agricultural lands for agricultural use to achieve the purposes of:
>
> > (1)   Conserving and protecting agricultural lands;
> >
> > (2)   Promoting diversified agriculture;
> >
> > (3)   Increasing agricultural self-sufficiency; and
> >
> > (4)   Assuring the availability of agriculturally suitable lands,
>
> pursuant to article XI, section 3, of the Hawaii State Constitution.

HRS § 205-41 (2017).

One important objective in identifying important agricultural lands was to "increase agricultural self-sufficiency for current and future generations."  HRS § 205-42(b) (2017).  Policies, plans, ordinances, and rules "shall promote the long-term viability of agricultural use of important agricultural lands" and shall "[d]iscourage the fragmentation of important agricultural lands and the conversion of these lands to nonagricultural uses."  HRS § 205-43(2) (2017).

### (b) Permitted and Prohibited Uses

In subsection (a) of HRS § 205-4.5, the legislature restricted agricultural districts with a "productivity rating class A or B" to 23 permissible uses.  HRS § 205-4.5(a).  One such permissible use is "[p]ublic and private open area types of recreational uses, including day camps, picnic grounds, parks, and riding stables, <u>but not including</u> dragstrips, airports, drive-in theaters, golf courses, golf driving ranges, country clubs, and <u>overnight camps</u>."  HRS § 205-4.5(a)(6) (emphases added).

In subsection (b) of HRS § 205-4.5, the legislature mandated that any use not expressly permitted in subsection (a) was prohibited except as permitted by Special Permit pursuant to HRS § 205-6:

> <u>Uses not expressly permitted in subsection (a) shall be prohibited, except the uses permitted as provided in sections 205-6</u> and 205-8 . . . .  Any other law to the contrary notwithstanding, no subdivision of land within the agricultural district with soil classified by the land study bureau's detailed land classification as over (master) productivity rating class A or B shall be approved by a county unless those A and B lands within the subdivision are made <u>subject to the restriction on uses as prescribed in this section and to the condition that the uses shall be primarily in pursuit of an agricultural activity</u>.

7

> Any deed, lease, agreement of sale, mortgage, or other instrument of conveyance covering any land within the agricultural subdivision shall expressly contain the restriction on uses and the condition, as prescribed in this section that <u>these restrictions and conditions shall be encumbrances running with the land until such time that the land is reclassified</u> to a land use district other than agricultural district.

HRS § 205-4.5(b) (emphases added).

### (c) Special Permit and District Boundary Amendment

As referenced above, the Special Permit process of HRS § 205-6 allows the county planning commission to "permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified" "but only when the use would promote the effectiveness and objectives of this chapter; provided that a use proposed for designated important agricultural lands shall not conflict with any part of this chapter." HRS § 205-6(a) and (c); <u>Waianae Coast</u>, 64 Haw. at 269-70, 639 P.2d at 1101.

"The special use or exception evolved as a land use control device from a recognition of the hardship frequently visited upon landowners due to the inherent rigidity of the Euclidean zoning system, and the inapplicability of variance or boundary amendment procedures to all land use problems." <u>Id.</u> at 270, 639 P.2d at 1101-02. Unlike a district boundary amendment (reclassifying land) and a variance (permission to use property in a manner forbidden by law), "a special permit allows the owner to put his land to a use <u>expressly permitted by ordinance or statute on proof that certain facts and conditions exist</u>, without altering the underlying zoning classification." <u>Id.</u> at 270-71, 639 P.2d at 1102 (emphasis added).

8

"Its essential purpose, as explained by the state Attorney General, is to provide landowners relief in exceptional situations where the use desired would not change the essential character of the district nor be inconsistent therewith." Id. at 271, 639 P.2d at 1102 (citing 1963 Op. Att'y Gen. 63-37). Unlike district boundary amendments, Special Permits provide an "expedited review," which "underscore[s] the necessity for their proper application to the particular land use problems they were designed to address." Id. at 272, 639 P.2d at 1102.

"[U]se of the special permit to effectuate essentially what amounts to a boundary change would undermine the protection from piecemeal changes to the zoning scheme guaranteed landowners by the more extensive procedural protections of boundary amendment statutes." Id. at 272, 639 P.2d at 1102-03 (citations omitted). The Hawaiʻi Supreme Court did "not believe that the legislature envisioned the special use technique to be used as a method of circumventing district boundary amendment procedures to allow the ad hoc infusion of major urban uses into agricultural districts." Id. at 272, 639 P.2d at 1103; Save Sunset Beach Coalition v. City & Cnty. of Honolulu, 102 Hawaiʻi 465, 482, 78 P.3d 1, 18 (2003) (observing "that the 'reasonable and unusual' exception permitted by HRS § 205-6 cannot be utilized to circumvent the essential purpose of the agricultural district").

In sum, HRS chapter 205 aims to preserve agricultural land in Hawaiʻi and promote agricultural self sufficiency for future generations.

9

## B.  LUC's Decision and Mahaʻulepu

As an initial matter, LUC contends that Foundation waived its Mahaʻulepu argument.  Foundation, however, does not appear to have raised a new argument by citing Mahaʻulepu.  Instead, Foundation cited Mahaʻulepu as new authority to support its existing argument that it could obtain approval to develop an overnight camp on class B agricultural lands through the Special Permit process.

Turning to LUC's and Homeowner's contention that the circuit court erred by holding overnight camping may be addressed through a Special Permit, their arguments are well taken as LUC's decision appears to be supported by canons of statutory construction.  The Special Permit statute, HRS § 205-6, is a general statute and the exclusion of overnight camps from the permitted use of "public and private open area type of recreation uses," HRS § 205-4.5(a)(6), is a specific statute.  And where there is ambiguity, the specific statute must control over the general statute.  Yoshimura v. Kaneshiro, 149 Hawaiʻi 21, 39, 481 P.3d 28, 46 (2021) ("Under ordinary canons of construction, a more specific statute controls over a more general statute").  Also, as an exception to the permitted use, the exclusion of overnight camps should be strictly construed.  State v. Russell, 62 Haw. 474, 480, 617 P.2d 84, 88 (1980) ("It is a well settled rule of statutory construction that exceptions to legislative enactments must be strictly construed").  Finally, allowing overnight camps through a Special Permit when overnight camps were expressly excluded from a particular permitted use appears to render the express exclusion meaningless, and a statute cannot

be interpreted so as to render it a nullity. City & Cnty. of Honolulu v. Hsuing, 109 Hawaiʻi 159, 173, 124 P.3d 434, 448 (2005) ("[O]ur rules of statutory construction requires us to reject an interpretation of a statute . . . that renders any part of the statutory language a nullity").

In addition, LUC's decision appears to perpetuate the purposes of the constitutional mandate and statutory scheme, which is to promote the "health and sustainability of agriculture" and "increase agricultural self-sufficiency for current and future generations." An overnight camp, as well as a drag strip, airport, drive-in theater, golf course, golf driving range, and country club, on class B agricultural land does not on its face promote the sustainability of agriculture or increase agricultural self-sufficiency for future generations.

Importantly, a special permit is not a variance to allow an impermissible use; "a special permit allows the owner to put his land to a use expressly permitted by ordinance or statute on proof that certain facts and conditions exist, without altering the underlying zoning classification." Waianae Coast, 64 Haw. at 270-71, 639 P.2d at 1102 (emphasis added). And here, overnight camping was not "expressly permitted by ordinance or statute." Instead, the legislature expressly excluded overnight camping from an expressly permitted use on class A and B agricultural land.

Nonetheless, this Court is bound by legal precedent. Over thirty years ago, in 1990, the Hawaiʻi Supreme Court interpreted the same statute, HRS § 205-4.5(a)(6), as applied to a golf course. In that appeal, the supreme court analyzed

11

whether the provisions of HRS chapter 205 prohibit the county planning commission from issuing special use permits for golf courses on prime agricultural lands classified as Class A or B. Mahaʻulepu, 71 Haw. at 333-34, 790 P.2d at 907.  The supreme court then held that HRS chapter 205 did indeed provide the authority for such permits.  Id.

The supreme court reasoned that, although golf courses are not permitted on class A and B agricultural lands under HRS § 205-4.5(a), subsection (b) "nonetheless allows those uses for which special permits may be obtained under § 205-6."  Id. at 336, 790 P.2d at 908-09.  The supreme court explained that "[s]ection 205-6 vests in the planning commissions the authority to issue special permits for uses that, while not otherwise permitted within agricultural districts, are nonetheless 'unusual and reasonable' uses that promote the effectiveness and objectives of Chapter 205."  Id. at 336-37, 790 P.2d at 909.

Although the supreme court did not analyze whether a golf course promoted the effectiveness and objectives of HRS chapter 205, it noted that "if the legislature had intended absolute protection from golf course uses for A and B rated agricultural lands, it would have done so unequivocally by prohibiting the issuance of permits for golf courses under the special permit provisions of § 205-4.5(b) or by employing clearly prohibitory language."  Id. at 338-339, 790 P.2d at 910. Notably, at the time Mahaʻulepu was decided, HRS § 205-2(d) provided that uses in agricultural districts shall include "open area recreational facilities, including golf courses and golf driving ranges, provided that they are not located within

12

agricultural district lands with soil classified . . . class A or B." HRS § 205-2(d) (Supp. 1990) (emphasis added).

Fifteen years after Mahaʻulepu, in 2005, the legislature amended HRS § 205-2(d) by specifically prohibiting golf courses in agricultural districts, subject to a grandfather clause for golf courses and golf driving ranges approved by a county before July 1, 2005. HRS § 205-4.5(d); 2005 Haw. Sess. Laws Act 205 §§ 2-3 at 670-71. The statutory amendment mentioned only "golf courses and golf driving ranges"; it did not mention any of the other uses excluded by HRS § 205-4.5(a)(6).

Thus, although the legislature effectively abrogated Mahaʻulepu's specific application to golf courses in 2005, it did not otherwise address Mahaʻulepu's interpretation that HRS chapter 205 provides authority for issuing special permits allowing HRS § 205-4.5(a)(6) excluded uses (dragstrips, airports, drive-in theaters, country clubs, and overnight camps) on class A and B agricultural land. LUC is afforded deference in interpreting its own statute, but the Hawaiʻi Supreme Court is the "final arbiter" of Hawaiʻi statutes. And this court, like the circuit court, is bound by the Hawaiʻi Supreme Court's interpretation of the HRS § 205-4.5(a)(6) exclusions in Mahaʻulepu. See Alakai Na Keiki, Inc. v. Matayoshi, 127 Hawaiʻi 263, 278, 277 P.3d 988, 1003 (2012). To the extent LUC's decision is contrary to Mahaʻulepu, it was palpably erroneous.

13

## C.    Intervention

Finally, LUC contends it properly denied the Intervention Request as moot because it granted the Petition without setting a contested case hearing, leaving nothing in which to intervene.  On the other hand, Foundation claims it had a due process property interest because it leased the Subject Land "for the sole purpose of using the land for an overnight camp[,]" and "[b]y taking away [its] ability to engage in that use under a special use permit, [LUC] impacted [its] property right."

A "contested case" is "an agency hearing that 1) is required by law and 2) determines the rights, duties, or privileges of specific parties.  An agency hearing that is required by law may be required by 1) agency rule, 2) statute, or 3) constitutional due process."  Mauna Kea, 136 Hawaiʻi at 390, 363 P.3d at 238 (citations, internal quotation marks, and parentheses omitted).  A "'party' means each person named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in any court or agency proceeding." HRS § 91-1 (Supp. 2021).

But "discretionary hearings are not contested cases because they are not required by law."  Lingle v. Hawaiʻi Gov't Emps. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawaiʻi 178, 184, 111 P.3d 587, 593 (2005).  Where a hearing was discretionary, LUC was not required by agency rule or statute to set a contested case hearing on the matter and to admit Foundation as a party.

14

Moreover, "for procedural due process protections to apply, [the party] must possess an interest which qualifies as property within the meaning of the constitution. . . . [A] protected property interest exists in a benefit — tangible or otherwise — to which a party has a legitimate claim of entitlement." In re Application of Maui Elec. Co., Ltd., 141 Hawaiʻi 249, 260, 408 P.3d 1, 12 (2017) (citations and internal quotation marks omitted). Thus, for Foundation to have a right to intervene, it must have a protected property interest in obtaining a Special Permit such that unavailability of the Special Permit process is a denial of due process.

LUC has broad discretion to grant or deny a Special Permit for a non-permitted use, see Waianae Coast, 64 Haw. at 268, 639 P.2d at 1100 (noting that judicial review of LUC decisions on Special Permit applications are limited only to errors of law or abuse of discretion), and neither the Hawaiʻi nor United States Constitution recognizes entitlement to a benefit - implicating a due process property interest - where the reviewing body has "broad discretion" to grant or deny the benefit, beyond merely determining whether the applicant failed to meet the statutory terms of eligibility. See Alejado v. City & Cnty. of Honolulu, 89 Hawaiʻi 221, 229, 971 P.2d 310, 318 (App. 1998) (recognizing that a reviewing body's complete discretion to grant or deny a benefit based on its assessment of "needs" generally does not create a constitutionally protected property right); see also Shanks v. Dressel, 540 F.3d 1082, 1091 (9th Cir. 2008) ("Only if the governing statute compels a result upon compliance with certain criteria, none of which involve the

exercise of discretion by the reviewing body, does it create a constitutionally protected property interest." (Internal quotation marks omitted.)).

Because Foundation had no constitutional entitlement to develop the Proposed Campground through a Special Permit, LUC was not required as a matter of due process to set a contested case hearing and admit Foundation as a party. Thus, the circuit court erred in reversing the Order Denying Intervention.

## IV. CONCLUSION

For the above reasons, we vacate in part the circuit court's February 16, 2017 Final Judgment and January 14, 2017 Order with regard to the reversal of LUC's Order Denying Intervention, and remand to LUC for further proceedings consistent with this opinion.

DATED:  Honolulu, Hawaiʻi, May 23, 2022.

On the briefs:

Deborah K. Wright
Keith D. Kirschbraun
Douglas R. Wright,
for Appellees-Appellants
PUʻUNOA HOMEOWNERS ASSOCIATION,
INC. and ROSS R. SCOTT.


Robert T. Nakatsuji,
Deputy Solicitor General,
for Appellee-Appellant
LAND USE COMMISSION, STATE OF
HAWAIʻI.


James W. Geiger,
for Appellant-Appellee
HOʻOMOANA FOUNDATION.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Karen T. Nakasone
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge